*Decision will be entered under Rule 50.*

DAVENPORT HOSIERY MILLS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36543. Filed April 30, 1957.

*H. James Hitching, Esq.*, for the petitioner.
*William T. Holloran, Esq.*, for the respondent.

ARUNDELL, *Judge:* Respondent, in accordance with the provisions of section 732 of the Internal Revenue Code of 1939, gave notice of the disallowance of claims for refund (Form 991) of excess profits taxes asserted in petitioner's applications for relief under section 722 of the 1939 Code for the taxable (calendar) years 1940 to 1945, inclusive, and of the related claim (Form 843) for the year 1942.

The parties have stipulated that the claim for 1944 was not timely filed and is barred by the statute of limitations.

The only issue is whether petitioner is entitled to relief under section 722 (a) and (b) (4) of the 1939 Code. In its petition, petitioner had also alleged that it was entitled to relief under section 722 (b) (3), but it waived that issue at the hearing.

The evidence was heard by a commissioner of this Court. Both parties have filed proposed findings of fact and objections to the findings proposed by the opposite party, together with briefs and reply briefs.

### FINDINGS OF FACT.

A stipulation and a supplemental stipulation of facts are incorporated herein by this reference.

Petitioner is a corporation organized in 1927 under the laws of the State of Delaware. It succeeded in a tax-free reorganization two Tennessee corporations: Davenport Hosiery Mills, which began business on May 17, 1919, and Davenport Silk Mills, which started operations in 1923. Prior to 1926, petitioner's predecessors manufactured women's seamless hosiery. From 1926 to 1930, it or its predecessors manufactured both women's full-fashioned and seamless hosiery. From 1930 on, petitioner manufactured only women's full-fashioned hosiery under the brand name of Humming Bird.

Petitioner filed with the collector of internal revenue at Nashville, Tennessee, Federal corporation income and declared value excess-profits tax returns and Federal corporation excess profits tax returns for the calendar years 1940 to 1945, inclusive. It filed timely applications for relief under section 722[1] for the calendar years 1940, 1941, 1942, 1943, and 1945. It did not file a timely application for such relief for the calendar year 1944.

At all times pertinent hereto, petitioner kept its books and reported its income for Federal income taxes on the accrual method of accounting and on the basis of a calendar year.

Petitioner's excess profits tax liability (without the benefit of section 722) for the years 1940 through 1945 is as follows:

| | | | |
|---|---|---|---|
| 1940 | $19,721.33 | 1943 | $617,145.72 |
| 1941 | 347,987.95 | 1944 | 670,683.15 |
| 1942 | 37,212.01 | 1945 | 553,625.02 |

Petitioner is entitled to use the excess profits credit based on income pursuant to section 713. Its average base period net income (without the benefit of section 722), computed under the growth formula provided for in section 713 (f), is $242,700.20 for the year 1940 and $291,612.29 for the years 1941, 1942, 1943, and 1945. Petitioner's arithmetical average base period net income (without the benefit of section 722), prior to the application of the growth formula provided for in section 713 (f), is $194,905.55 for the year 1940 and $234,638.78 for the years 1941, 1942, 1943, and 1945.

---

[1] All references to section numbers are of the Internal Revenue Code of 1939 unless otherwise indicated.

Petitioner's net taxable income and excess profits net income before Federal taxes for the base period years 1936 through 1939 are as follows:

| Year | Net taxable income | Excess profits net income |
|---|---|---|
| 1936 | $163, 510. 13 | $155, 523. 74 |
| 1937 | 230, 610. 66 | 219, 701. 06 |
| 1938 | 292, 589. 53 | 291, 612. 29 |
| 1939 | 271, 629. 91 | 271, 708. 04 |
| Average | $239, 585. 06 | [2] $234, 636. 28 |

Petitioner's executive offices, mill, and principal place of business have at all times been located in Chattanooga, Tennessee. Its stock is held by about 700 stockholders all over the country and is listed on the American Stock Exchange, formerly known as the New York Curb Exchange. It is a member of the Southern Hosiery Manufacturers Association.

Petitioner's plant during the base period consisted of a 4-story building about 90 by 220 feet. During this period it had over 1,100 employees. Its production during this period, in dozens of pairs, including stockings purchased from others (in the gray), was as follows:

| 1936 | 414, 908 |
|---|---|
| 1937 | 460, 805 |
| 1938 | 551, 017 |
| 1939 | 592, 478 |

The gross shipments of women's full-fashioned hosiery of all kinds in the United States during 1936 through 1942 were, in dozens of pairs, as follows:

| 1936 | 37, 402, 000 | 1940 | 43, 266, 000 |
|---|---|---|---|
| 1937 | 39, 679, 000 | 1941 | 42, 656, 000 |
| 1938 | 41, 945, 000 | 1942 | 35, 580, 000 |
| 1939 | 43, 077, 000 | | |

One of the factors in determining the capacity of a hosiery-knitting mill is the number of legger sections in place, that is, the number of stockings that can be knitted at one time. The number of legger sections in place in petitioner's plant, by gauges,[3] during the base period was as follows:

---

[3] A "gauge" is the measure of the fineness of the knit. A 42-gauge knitting machine, for instance, is a machine that has 42 needles to each inch and a half of the needle bar. A 45-gauge has 45 needles and a 51-gauge has 51 needles to each inch and a half of the bar.

| Date | 42-gauge | | 45-gauge | | 51-gauge | | Total sections |
|---|---|---|---|---|---|---|---|
| | Number | Per cent of total | Number | Per cent of total | Number | Per cent of total | |
| Jan. 1, 1936 | 716 | 48.44 | 624 | 42.22 | 138 | 9.34 | 1,478 |
| Added 1936 | | | 48 | | 96 | | 144 |
| Jan. 1, 1937 | 716 | 44.14 | 672 | 41.43 | 234 | 14.43 | 1,622 |
| Added 1937 | | | | | 72 | | 72 |
| Jan. 1, 1938 | 716 | 42.26 | 672 | 39.67 | 306 | 18.07 | 1,694 |
| Added 1938 | | | 96 | | | | 96 |
| Jan. 1, 1939 | 716 | 40.00 | 768 | 42.91 | 306 | 16.87 | 1,790 |
| Added 1939 | | | | | 176 | | 176 |
| Jan. 1, 1940 | 716 | 36.42 | 768 | 39.06 | 482 | 24.52 | 1,966 |

At the close of the years 1936 to 1942, inclusive, petitioner had a higher percentage of 51-gauge legger sections in place than did the industry. The percentages are as follows:

| Year | Petitioner | Industry |
|---|---|---|
| | Per cent | Per cent |
| 1936 | 14.43 | 2.00 |
| 1937 | 18.07 | (1) |
| 1938 | 16.87 | 4.40 |
| 1939 | 24.52 | (1) |
| 1940 | 26.69 | 6.00 |
| 1941 | 39.83 | (1) |
| 1942 | 51.68 | 9.20 |

1 Not available.

The number of knitting machines (leggers and footers combined) in place in petitioner's plant, by gauges, during the base period was as follows:

| Date | 42-gauge | 45-gauge | 51-gauge | Total |
|---|---|---|---|---|
| Jan. 1, 1936 | 35 | 26 | 6 | 67 |
| Added 1936 | | 2 | 4 | 6 |
| Jan. 1, 1937 | 35 | 28 | 10 | 73 |
| Added 1937 | | | 3 | 3 |
| Jan. 1, 1938 | 35 | 28 | 13 | 76 |
| Added 1938 | | 4 | | 4 |
| Jan. 1, 1939 | 35 | 32 | 13 | 80 |
| Added 1939 | | | 7 | 7 |
| Jan. 1, 1940 | 35 | 32 | 20 | 87 |

The percentage distribution by gauge of Reading full-fashioned knitting machines (leggers and footers combined) "produced" as distinguished from being "in place" by the Textile Machine Works during the base period years is as follows:

| Year | 42-gauge | 45-gauge | 48-gauge | 51-gauge |
|------|----------|----------|----------|----------|
|  | Per cent | Per cent | Per cent | Per cent |
| 1936 | 18.0 | 72.0 | 3.0 | 7.0 |
| 1937 | 10.0 | 79.5 | .5 | 10.0 |
| 1938 | 5.5 | 83.1 | .2 | 11.2 |
| 1939 | 3.0 | 65.0 | 2.0 | 30.0 |

Petitioner's mill was above the average with respect to fine gauge machinery. It had always been considered one of the most efficient full-fashioned mills in the industry.

During 1938, E. I. duPont deNemours & Company (hereinafter referred to as duPont) developed and at all times material herein has been the sole producer of nylon yarn. On or about February 15, 1937, and June 28, 1938, respectively, duPont filed applications for patents covering nylon products, which patents were granted by the United States Patent Office on May 9, 1939.

During 1938, petitioner examined a seaming thread called Neophil and learned that it was made of nylon produced by duPont. On November 18, 1938, petitioner wrote duPont as follows:

We have been making some experiments with a seaming thread known as Neophil, which we obtained from the Premier Thread Company, Pawtucket, R. I.

We are extremely anxious to make knitting tests on the same fibre, if it can be gotten in the proper size for leg yarn; namely, the equivalent of two, three or four thread silk, or the equivalent of 28, 42 or 56 denier.

We would like to know if it is at all possible to get a few samples for this purpose, and would appreciate your assistance in this direction.

On November 25, 1938, duPont wrote petitioner, the first two paragraphs of which are as follows:

Thank you for your interesting letter of November 18. I wish that we were as far along with our hosiery yarn as we are with our yarn for sewing thread. The fact is that any production we are now making is subject to change because it is purely experimental and the poundage is extremely limited.

As soon as we have developed a yarn that we consider to be satisfactory for full-fashioned hosiery, we shall be glad to supply you with samples.

After a further exchange of correspondence in 1938, duPont on or about December 31, 1938, sent petitioner a few pairs of nylon hosiery as samples. Petitioner tested these and had women employees wear them to ascertain their fit, appearance, wearability, and acceptability as a product for petitioner's plant. The reactions of petitioner and the women employees were very favorable. Petitioner then started in every way it could to obtain nylon yarn as soon as possible.

In December 1938, duPont placed in operation a plant which it referred to as a pilot plant for the manufacture of nylon yarn. In December 1939, duPont commenced operating a plant for the manufacture of nylon yarn, called the Seaford plant, which duPont referred to as its commercial plant. DuPont commenced shipments

of nylon yarn which it referred to as commercial shipments early in 1940.

Early in 1939, two officers of petitioner met in New York with the then sales manager and assistant sales manager of the Nylon Division of duPont. The duPont representatives told petitioner's officers that duPont was having difficulties with some of the larger manufacturers in showing proper interest in the development of the yarn into hosiery, that the stockings had to be "preboarded" (shaped under heat and pressure before being dyed), and that no preboarding machine was available for petitioner. Petitioner's officers replied that petitioner would make a preboarding machine and do whatever else would be necessary to get into production of nylon hosiery. It was arranged that duPont would send petitioner some nylon yarn as soon as it could.

Petitioner then began receiving shipments of duPont nylon yarn. The first such shipment was on March 29, 1939, following which duPont sent an engineer to petitioner's plant to advise it in the production of nylon hosiery. The second shipment was on June 7, 1939, and the shipments continued thereafter approximately monthly until November 1939. The 1939 shipments of nylon yarn to petitioner aggregated 1,289.2 pounds at a cost to petitioner of $4,862.82.

Also, in 1939, representatives of petitioner made a trip to Wilmington, Delaware, to see officials of the duPont Nylon Division, made a tour through the entire Seaford, Delaware, nylon plant of duPont, and early in 1939 made a trip to a plant of Apex Hosiery Company at Philadelphia, Pennsylvania, primarily to see a preboarding machine which duPont had placed there.

A preboarding machine consisted of hosiery leg shapes, on which the stockings were stretched, put in a chamber, and subjected to steam and pressure. Silk stockings were dyed without preboarding and then boarded into shape after dyeing. This could not be done with nylon stockings because the heat of dyeing would wrinkle them and they would never recover their original shape through the normal method of boarding. Petitioner, therefore, had to: (1) Construct a preboarding machine, similar to a boarding machine, but carrying much higher temperatures and steam pressure, (2) preboard the nylon stockings before dyeing, and then (3), after dyeing, also proceed with a regular boarding operation on the nylon hosiery.

A preboarding machine, consisting of a metal steam cabinet in which boarding forms were inserted, was constructed early in 1939 by petitioner at a cost of about $3,000. Also, in 1939, petitioner ordered from Combustion Engineering Company of Chattanooga, Tennessee, additional parts to enable four more preboarding units to be constructed at an additional cost of over $3,000. These additional parts were not received until February 9, 1940.

In 1939, petitioner made changes in its knitting machines in keeping with the amount of nylon yarn received. These changes were in the moistening apparatus and the guides and carrier tubes. It also gave special training to the operators in the knitting of nylon hosiery. During 1939, petitioner devoted 2 complete knitting machines of 24 sections each to the production of nylon hosiery.

By the end of 1939, petitioner had manufactured 19,332 pairs (1,611 dozen pairs) of nylon hosiery. All except 12 dozen pairs of these were 51-gauge. Of these, 6,753 pairs were sold in 1939 to its employees who were required to report to petitioner on their wearing quality and fit. In addition, 7,371 pairs of petitioner's 1939 production of nylon hosiery were sold by it in 1939 to duPont on a regular commercial basis subject to duPont's acceptance. In 1939, duPont sold about 7,000 pairs of the nylon hosiery made by petitioner to retail establishments in Wilmington, Delaware, for resale. The Wilmington establishments in turn sold nylon hosiery to the public in 1939. The nylon stockings made by petitioner in 1939 were, except for the very first few, entirely satisfactory and a commercially salable article. None of the 7,371 pairs sold to duPont or the 6,753 pairs sold to petitioner's employees was rejected. The reaction of the public to nylon hosiery in Wilmington in 1939 was fabulous, and this was known to petitioner. Its customers besieged it with requests for this product. There was an understanding, however, that, except for sales to the Wilmington public and to petitioner's employees, nylon hosiery would not be sold at large until May 15, 1940, a preselected opening date when nylon hosiery was placed on sale simultaneously throughout the Nation. Petitioner made its first direct shipment to retail establishments in May 1940.

In the publication, The Underwear & Hosiery Review for December 1939, the nylon hosiery then being sold in the retail stores of Wilmington, Delaware, was referred to throughout the article as a "new product" or as "the new stockings."

Before the end of 1939, petitioner's management decided to convert the entire production of its plant solely to nylon hosiery as early as, and to the greatest extent, possible. In pursuance of such course of action, duPont, on December 18, 1939, allotted to petitioner and petitioner ordered from duPont 67,340 pounds of nylon yarn costing $248,120 for delivery during the first half of 1940. Due to nylon yarn scarcity, the complete conversion of petitioner's plant to nylon hosiery did not take place until after World War II.

Petitioner also, during 1939, spent approximately $1,000 in having its textile engineer go to duPont's Seaford plant to study the throwing of nylon yarn. Throwing consists of twisting the yarn and coating it with a sizing material. DuPont did not allow nylon yarn to be thrown

in a plant until the plant had a man trained by duPont in throwing. As a result of petitioner's being committed to this course of action, duPont sold a sizing machine to petitioner in March 1940 at a cost to petitioner of $4,393.10. Petitioner was the first nylon hosiery manufacturer to get a sizing machine. This machine and the engineer's training enabled petitioner to throw its own yarn and thus to obtain more nylon yarn, since it was easier to get unthrown than thrown nylon yarn.

Petitioner also, in and prior to 1939, had surveys, plans, and specifications made, and engaged in negotiations with and made an oral commitment to the Carrier Corporation for additions to the air conditioning of its plant to obtain the temperature and humidity control necessary for satisfactory throwing of nylon yarn and production of nylon hosiery. This equipment, which was not needed (although partly desirable) for the production of silk hosiery, was formally contracted for in March and April 1940, after all of the plans and specifications had been finalized, and was installed at an aggregate cost of about $84,000.

The total production and sales of nylon yarn by duPont in pounds during the years 1938 through 1941 were as follows:

| Year | Production (lbs.) | Sales (lbs.) |
|------|----------------|-----------|
| 1938 | (1) | 3, 400 |
| 1939 | (1) | 41, 800 |
| 1940 | 2, 690, 700 | 2, 638, 400 |
| 1941 | 7, 282, 400 | 7, 179, 800 |

1 Figure not available but approximately the same as sales.

Substantially all of the nylon yarn produced in the above years went to the hosiery industry. The 1940 and 1941 shipments of nylon yarn to petitioner aggregated 114,650.4 and 148,072.7 pounds, respectively.

On January 10, 1940, petitioner and duPont entered into an agreement whereby duPont granted to petitioner as licensee a nonexclusive, nonassignable, royalty-free license to manufacture and sell ladies' full-fashioned hosiery, made entirely of nylon yarn, and made with a minimum machine gauge of 45. Paragraph 3 of this agreement provided:

3. The license herein granted * * * is further limited to the manufacture, use and sale of hosiery which is sold by the LICENSEE, at not less than the following *net* selling prices per dozen pairs:

| First Grade | Net | Irregulars | Net |
|-------------|-----|-----------|-----|
| 45 Gauge | $8.25 | 45 Gauge | $6.50 |
| 48 Gauge | 9.00 | 48 Gauge | 7.00 |
| 51 Gauge and finer | 9.75 | 51 Gauge and finer | 7.50 |

Petitioner's 45- and 51-gauge machines in place at the end of 1939, to which the production of nylon hosiery was restricted, were of

sufficient capacity to process at least 320,000 pounds of nylon yarn per annum.

Nylon yarn, a thermoplastic, differs from silk yarn, an animal product, in a number of respects. Nylon yarn is absolutely uniform in diameter, regular in color, and free of defects and waste, whereas silk yarn was, in varying degrees according to grade, lacking in uniformity of size and irregular in color and contained slubs (long, thick places in the yarn), nibs, split filaments, and knots. Nylon yarn is stronger, more durable, and of much greater stretch and recovery than silk yarn of the same denier (diameter). Denier is a means of measuring nylon yarn by weight. Fifteen denier is the approximate equivalent of one thread of silk. Nylon yarn is also less moisture absorbent and is more soil resistant than silk. Due to the effect of heat setting the shape of nylon, it is capable of and requires presetting, resulting in the product holding its shape much better than silk.

Silk yarn was obtained principally from Japan. Arrangements had to be made 6 to 8 weeks in advance for the higher grades. The grading done by the Japanese could not be relied on, and it was considered desirable and was petitioner's practice to have the silk yarn graded again by reliable American testers. Differences between the grades claimed by the Japanese sellers and those found upon retesting were sources of controversy. Other difficulties in the supply situation arose from the fact that, being a natural product, silk supply was subject to growing conditions in the Far East, with consequent fluctuating supply and prices, forcing manufacturers to gamble as to raw material costs and inventory values.

Nylon, in contrast, turned out to be more dependable, subject to none of the foregoing difficulties, but supplied by a single, comparatively nearby, American producer, in a position to gauge accurately and accommodate its production to the amounts, quality, and types of the yarn needed by the industry, independent of weather or other external conditions affecting prices and quantities.

The throwing (sizing and twisting) of nylon yarn is entirely different from the throwing of silk yarn. Also, nylon yarn has to be cured, which was not true of silk yarn. Air conditioning (humidity and temperature control) are practically essential for manufacturing nylon hosiery. It was not essential in silk hosiery manufacturing.

Nylon hosiery is, in comparable deniers and gauges, far stronger than silk hosiery. This made it possible to produce serviceable nylon hosiery of much finer thread (or lower denier) and higher gauge than was practicable with silk. Such lower denier, higher gauge hose appears more sheer. Nylon yarn is also clearer or more translucent than silk, which is another reason why nylon stockings could be made more sheer appearing than silk stockings of the same strength. Sheerer-appearing stockings commanded higher prices.

In the publication, "The Underwear & Hosiery Review" for December 1939, it was stated that:

Locally one important fact has been established with regard to Nylon and that is, price is not a factor in the matter of sales. Buyers invariably ask for the $1.35 grade, the most expensive, and take others of lower price only when it is impossible to obtain this higher priced, but sheerer type.

Nylon stockings are less moisture absorbent and dry quicker than silk. They also have the feature, due to presetting, of holding their shape and of automatically returning to shape after being washed. Their shape-holding ability and resiliency prevents them, in contrast to silk hosiery, from becoming baggy and wrinkled.

Petitioner's change to nylon hosiery enabled it to eliminate many small customers and to concentrate more on selling to larger customers in larger amounts.

Prior to the installation of its preboarding machinery in 1939, petitioner's capacity for the manufacture of acceptable nylon hosiery was nonexistent, as preboarding was a necessary operation in the manufacture of acceptable nylon hosiery. Upon installation of such equipment in 1939, it created a capacity for the manufacture of nylon hosiery at the rate of approximately 88 to 90 dozen pairs per 8-hour shift per day, or about 90,000 dozen pairs per annum. Except for a week or two each year, petitioner at all times operated on a two-shift basis. Each shift consisted of 45 hours a week.

Upon ordering in 1939 additional parts needed for 4 additional preboarding units, petitioner committed itself to a further increase in capacity of its preboarding equipment for nylon hosiery by 5 times, or to about 450,000 dozen pairs per year, which was in excess both of the amount of nylon yarn available to it and of its productive capacity of fine-gauge machinery.

Nylon hosiery constituted a substantially new and different product from silk hosiery.

Petitioner, in entering upon its production of nylon hosiery, made substantial and permanent changes in the character of its business during the base period. The business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had made the changes in the character of its business 2 years before it did so.

If petitioner had changed to manufacturing nylon hosiery 2 years sooner, and assuming that duPont had made its change 2 years sooner, petitioner would have received during the last year of its base period at least 134,680 pounds of nylon yarn to be manufactured into nylon hosiery.

The average sales price per dozen pairs received by petitioner for its silk hosiery and the average net profit before Federal taxes per dozen pairs of silk hosiery during the base period were as follows:

| Base period year | Average sales price | Average net profit |
|---|---|---|
| 1936 | $6.55 | $0.39 |
| 1937 | 6.75 | .50 |
| 1938 | 6.52 | .53 |
| 1939 | 6.73 | .46 |

The average sales price per dozen pairs received by petitioner for its nylon hosiery sold in 1939 to its employees and to duPont was as follows:

| Style No. | Gauge | Denier | Dozen | Price | Average |
|---|---|---|---|---|---|
| 500 | 51 | 30 | 839 | $8,109.30 | $9.67 |
| 501 | Irregulars of Style 500 | | 321 | 2,144.37 | 6.68 |
| 500/1 | Seconds of Style 500 | | 17 | 77.48 | 4.56 |

The percentages of firsts, irregulars, and seconds manufactured and sold by petitioner during 1939 were as follows:

| Grade | Silk and nylons | | Nylons only | |
|---|---|---|---|---|
| | Dozen pairs | Percentage | Dozen pairs | Percentage |
| Firsts | 469,566 | 80.53 | 839 | 71.28 |
| Irregulars | 102,612 | 17.60 | 321 | 27.27 |
| Seconds | 10,933 | 1.87 | 17 | 1.45 |
| Total | 583,111 | 100.00 | 1,177 | 100.00 |

During the period 1938 through 1941, duPont supplied nylon yarn to ladies' hosiery manufacturers other than petitioner as follows:

| Year | Number of ladies' hosiery manufacturers supplied | Largest poundage to any one customer | Smallest poundage to any one customer |
|---|---|---|---|
| 1938 | 2 | 767 | 61 |
| 1939 | 35 | 2,480 | 6 |
| 1940 | 150 | 195,082 | 3 |
| 1941 | 271 | 350,335 | 5 |

A pound of nylon yarn would make about 1⅔ to over 2 dozen pairs of nylon hosiery of the type petitioner made in 1939. Out of 134,680 pounds of nylon yarn, petitioner could have made between 224,000 to over 269,000 dozen pairs of nylon hosiery annually.

There would have been a sufficient demand throughout the base period to absorb all the hosiery petitioner could have made out of 134,680 pounds of nylon yarn at the net selling prices agreed upon in the licensing agreement. To the extent that nylon hosiery would have been available during the base period, it would have displaced an equal number of pairs of silk hosiery during that period.

During the base period, petitioner had three officers. The compensation paid these officers was based on a percentage of petitioner's profits. During this period, petitioner also paid its salesmen a commission of 5.19 per cent of sales on all sales made.

The cost of manufacturing nylon hosiery was slightly greater than the cost of manufacturing silk hosiery.

Petitioner's excess profits tax for the years 1940, 1941, 1942, 1943, and 1945, computed without the benefit of section 722, results in an excessive and discriminatory tax.

Petitioner's average base period net income is an inadequate standard of normal earnings.

A fair and just amount representing normal earnings to be used as a constructive average base period net income is $351,000 for 1940 and $436,000 for 1941, 1942, 1943, and 1945.

### OPINION.

Petitioner claims relief under section 722 (a) and (b) (4) [4] on the grounds that it had a change in the character of its business during the base period by reason of a difference in the products furnished, a

---

[4] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) * * *, regard shall be had to the change in the character of the business under section 722 (b) (4) * * * to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(4) the taxpayer * * * during * * * the base period * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes * * * a difference in the products * * * furnished, a difference in the capacity for production or operation * * *. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business * * *

difference in the capacity for production or operation, a change in the capacity for production or operation consummated during 1940 as a result of a course of action to which petitioner was committed prior to January 1, 1940; that its business did not reach by the end of the base period the earning level it would have reached had these alleged changes been made 2 years earlier; and that as a result thereof it has established a constructive average base period net income of $502,480.64 for 1940, $624,302.03 for 1941, and $621,185.91 for 1942, 1943, and 1945. It is conceded that petitioner is entitled to use the excess profits credit based on income.

The respondent contends: (1) That hosiery made of nylon yarn does not constitute a new product furnished during the base period, and (2) that any reconstruction of petitioner's base period net income would not result in an amount in excess of petitioner's average base period net income determined under section 713 (f).

Respondent's position under (1) is twofold, first, that hosiery made of nylon yarn is not a "difference in the products" as that term is used in section 722 (b) (4) and, second, that if this Court should hold that hosiery made of nylon yarn is a difference in the products, then the product was not "furnished" during the base period.

Respondent submits that his position as to what constitutes a difference in the products is best expressed at page 52 of the Bulletin on Section 722.[5] This bulletin was issued primarily for employees of the Internal Revenue Service engaged in the administration of section

[5] This part of the bulletin provides:
In determining whether there is a difference in the product or services furnished. consideration should be given to the following factors:

(a) *Class of products or services furnished.*
If the new product or service is similar to the regular line of products or services previously furnished, it is doubtful if the taxpayer can establish that a "difference" exists. For example, a brewery which previously manufactured only light beer adds the production of dark beer and ale; or, an ice cream manufacturer adds new flavors; or, a bakery expands its line of bread and cake. In these instances the fundamental class of products furnished has remained unchanged and the nature of the operations is not essentially different after the addition of the new products from the nature of the operations prior to the addition.

(b) *Markets.*
A difference in the products or services furnished may be indicated if the consumer market for the new product is different than the old. For example, the market for the new product might be manufacturing establishments and other business concerns, while the market for the old products might be the retail store trade.

(c) *Manufacturing operations.*
A difference in the products furnished may be indicated if the manufacturing processes necessary to produce the new product are essentially different. For example, production of the new product may require technically skilled labor and machinery of types never before utilized.

(d) *Resemblance to existing products or services.*
If the end product is essentially the same in nature and use, the product may not be different, but merely a modification of an existing product. To illustrate, a linoleum manufacturer using cork and burlap as raw materials changed to wood fibre and cotton fabric. The finished product had the same character and use as before. The substitution of the new raw materials resulted in a modification of an existing product rather than a new product.

722. It represented the current trend of official opinion in the administration of that section at the time of its publication on November 2, 1944. We do not think, however, the particular paragraphs (a) to (d) cited by the respondent sustain his contentions in the instant case.

Paragraph (a) merely says "it is doubtful" that the taxpayer can establish a difference if the new product is "similar" to its regular line, illustrating "similar" by cases of routine additions to an established line. In our facts we have set out quite fully the differences between nylon and silk hosiery. These differences are substantial and in our opinion clearly show that, compared with silk, nylon hosiery was an entirely different product, and in nowise resembled the routine addition by a bakery of another kind of cake to its line of pastries. Trade publications in December 1939 referred to the nylon hosiery then being sold in the retail stores of Wilmington, Delaware, as a "new product" and as "the new stockings." Cf. *7-Up Fort Worth Co.*, 8 T. C. 52, where an additional type of soft drink was held to be a new product; and *Bardons & Oliver, Inc.*, 25 T. C. 504, where a ram-type Universal turret lathe was held to be so different from the lathes previously produced as to constitute a new product.

Paragraph (b) says there may be a difference in the products if the consumer market is different. The facts in the instant case show that petitioner's change to nylon hosiery enabled it to eliminate many small customers and to concentrate more on selling to larger customers in larger amounts. Respondent argues that the consumer market remained the same, namely, the American woman. It would seem that this is like saying television would not be a new product if sold to people who had bought radios. In our findings we have found that as to durability, washability, resilience, or shape-holding ability, appearance, and capacity for greater sheerness without loss of serviceability, the nylon stocking was a far better product than the silk stocking, and that it could be manufactured at only a slightly extra cost. That being so, it would seem that whereas comparatively few women could afford to keep themselves in fragile one-thread silk stockings that might not even last out one evening, a great many women could afford the very sheer nylon hosiery. Due to its inherent superior qualities, nylon hosiery was, therefore, salable to a much wider market.

Paragraph (c) says a difference in the products may be indicated if the manufacturing processes are essentially different. In this connection, the facts show that changes had to be made in the knitting machines. These changes were in the moistening apparatus and the guides and carrier tubes. The operators of the machines had to be given special training. The manufacture of nylon stockings required a new step not used in the manufacture of silk stockings. This was

the preboarding step. It required a machine never before utilized and in this respect satisfies the very example given in paragraph (c) as to what might constitute a difference in products.

Paragraph (d) says the product may not be different if the end product is essentially the same in nature and use. This test again depends upon whether the change in question is substantial or trivial. We think the facts show that the change to nylon was not only substantial but was revolutionary. But the respondent says the end product is the same, namely, women's full-fashioned hosiery. This could have been said of the lathe in *Bardons & Oliver, Inc., supra,* and also of the corset in *Charis Corporation,* 22 T. C. 191. The petitioner in the latter case, prior to the base period, had been manufacturing a corset known as the CHARIS garment. The figure was controlled in this type of corset by an inner belt, laces, boning, and rigid fabric. In 1935, it commenced the manufacture and sale of a corset known as the SWAVIS garment. The latter garment was elastic controlled, as distinguished from the lacer control of CHARIS, and contained no inner belt or laces, and very little boning. We held that the change to the manufacture and sale of the SWAVIS garment constituted a difference in the products furnished and, because of the higher level of earnings directly attributable thereto, a change in the character of the taxpayer's business.

Before passing this point, it may be noted that the bulletin mentioned two additional tests, (e) and (f),[6] not mentioned in respondent's brief. These tests clearly support the petitioner. The evidence received in this case shows beyond any doubt that the opinion of both the consumer and the trade regarded the nylon stocking as an entirely new product.

In support of his contention that nylon yarn is not a "difference in the products" as that term is used in the statute, the respondent has cited *Triangle Raincoat Co.,* 19 T. C. 548, and *A B C Brewing Corp.,* 20 T. C. 515. These are cases where the differences were routine and of

---

[6] These two additional tests are:

In determining whether there is a difference in the product or services furnished, consideration should be given to the following factors:

*       *       *       *       *       *       *

(e) *Consumer opinion.*

A difference in the products furnished may be indicated if the consumer considers the product to be new even though it may be similar in appearance to other products. If, in the opinion of the consumer, the product is regarded as being new because it has new uses, reacts differently or is purchased from a new source, it may constitute a different product.

(f) *Trade opinion.*

The regulations provide that "a product or service is different from another product or service if the trade custom or practice treats it as a product or service of a different class." *If the taxpayer can meet the test set forth in this specific language, the alleged new product or service must be deemed to constitute a difference in the products or services furnished.* [Emphasis supplied.]

little or no effect on the taxpayers' earning power. In our Opinion in the *Triangle* case, we said (pp. 565–566) :

The woolen garments were accepted by the trade as a normal addition to the line of weatherproofed outer garments manufactured by petitioner. * * * Our facts show that the introduction of woolen garments brought about no increased level of earnings.

Substantially the same idea was expressed in our Opinion in the *Brewing Corp.* case where we said, at page 536 :

While it [beer] may have been a better product, it was in no sense a new product. Such changes as there were in the formula or in the brewing process were no more than what any manufacturer might normally do to improve the quality and consumer acceptance of its products. It was not like the change in *7-Up Fort Worth Co.*, 8 T. C. 52, where the taxpayer was bottling "7-Up" exclusively and during the base period added a new non-competitive orange drink to its products, or like the addition of the ice-cream mix business in *Lamar Creamery Co.*, 8 T. C. 928.

The differences in the instant case were far from being mere routine changes as our findings clearly show. Also, the net profit from manufacturing nylon hosiery was much greater than from manufacturing silk hosiery. One of the witnesses for petitioner, Carl S. Kincaid,[7] testified that the net profit from manufacturing nylon hosiery was about five times as great.

We hold that hosiery made of nylon yarn constitutes a "difference in the products" as that term is used in section 722 (b) (4), *supra*, footnote 4.

We also disagree with the respondent's contention that the nylon hosiery manufactured by petitioner during 1939 was not "furnished" during the base period. This contention is based on the fact that there was an understanding with duPont that, except for sales to the Wilmington public and to petitioner's employees, nylon hosiery would not be sold at large until May 15, 1940, a preselected opening date when nylon hosiery was placed on sale simultaneously throughout the Nation. But during 1939 petitioner did manufacture and sell 6,753 pairs of nylon hosiery to its employees and 7,371 pairs to duPont which duPont said in a letter to petitioner's secretary-treasurer was "on a regular commercial basis, subject to our acceptance." DuPont accepted the 7,371 pairs and during 1939 sold about 7,000 pairs of the same hosiery to retail establishments in Wilmington for resale to the public, which resale took place during 1939.

Webster's New International Dictionary, Second Edition, defines "furnished" as meaning "supplied" or "provided." Undoubtedly, petitioner in 1939 supplied or provided duPont and its own employees

---

[7] Kincaid is president of Magnet Mills, Inc., a competitor of petitioner's and has been actively engaged in the industry for 46 years. He is a former president of Southern Hosiery Manufacturers Association, and has served on the N. R. A. Hosiery Code Authority and in the Knit Goods Section of the War Production Board.

with over 14,000 pairs of nylon hosiery, who paid for them and kept them or, in the case of duPont, sold them to others. Whether a company sells its entire production to a single customer or to a large number of customers, we think it is "furnishing" goods and is engaged in a commercial activity.

The respondent cites *Claussner Hosiery Co.*, 16 T. C. 1335, as supporting his position. We think the facts in *Claussner* are entirely different from the facts in the instant case. In *Claussner* we found (pp. 1338, 1342–1343) that the taxpayer "sold no hosiery manufactured of nylon yarn during the base period nor prior to May 15, 1940" and that to and including December 31, 1939, the only hosiery made of nylon which Claussner submitted to duPont for tests was 37¼ dozen pairs, "all of which were rejected by duPont and returned to petitioner." In the instant case, petitioner actually manufactured and sold during the base period over 14,000 pairs of nylon hosiery.

In *Bergstrom Paper Co.*, 26 T. C. 1167, the taxpayer, on August 25, 1939, entered into a contract to deliver steam (a new product) to the Kimberly-Clark Corporation for a period of 5 years and successive yearly periods. Before the steam could be delivered, certain meters and connections had to be installed. Work toward this installation was commenced immediately and in January or February 1940 petitioner began to deliver the steam agreed upon in the 1939 contract. In holding that petitioner changed the character of its business by reason of a difference in products furnished, we said in part (p. 1171) :

The taxpayer had no earnings during the base period from the sale of steam, but it derived a substantial amount of income from sales of steam to Kimberly-Clark during the taxable years. Thus its average base period net income does not reflect the normal operation of the business on which the petitioner is being taxed during the taxable years. This is the type of situation that Congress had in mind in granting relief. The furnishing of steam was a difference in the products or services furnished. It is not fatal in this case that it did not actually furnish any steam under the contract during the base period. Section 722 (b) (4) does not expressly require that the new product or service produce income during the base period. Indeed, the very fact that it was not producing normal income at the end of the base period is the reason for the granting of relief. The eventual sales began early in the following year pursuant to the contract entered into on August 25, 1939, and delivery was made through the equipment which the parties had procured in 1939. These facts distinguish this case from such cases as *Claussner Hosiery Co.*, 16 T. C. 1335. Cf. *7-Up Fort Worth Co.*, 8 T. C. 52, in regard to the new product, Nesbitt orange beverage, of which no sales were made until 1940. * * * Congress has indicated that the provisions of section 722 (b) should be administered sympathetically to bring about the relief intended, and it surely did not intend to differentiate between a corporation like the petitioner and another where the only difference was that the latter actually delivered some of the new product before the end of the base period. * * *

In the instant case, we hold that petitioner changed the character of its business during the base period by reason of a "difference in the

products * * * furnished" as that phrase is used in section 722 (b) (4), *supra*, footnote 4.

It is noted that respondent in his main brief recognizes no other qualifying factor than the one we have just considered and, in his reply brief in answer to petitioner's claim that it also had a qualifying factor in the nature of a difference or change in capacity for production, said that such a claim "is not at issue in this case." That is not in accord with that part of the opening statement of counsel for petitioner wherein he said:

Also in the petition there is sought to be advanced under (b) (4), ground for relief on the basis of an increase in capacity in knitting machines. That feature will not be pressed except in association with what is the prime or major ground for relief, the turn to nylon hosiery. We still will wish to treat this as a capacity case in the sense that our changes in capacity opened the door to our nylon hosiery production, or greater nylon hosiery production, and we should not be limited by the capacity in former years. But as and of itself on the ground of capacity alone, we are not pressing.

We have, to the limited extent stated by counsel for petitioner, regarded the matter of capacity for production as an issue to be considered. In fact, the parties have stipulated the increase in capacity regarding the number of legger sections and knitting machines that were added during the base period, and we have found that, in addition, petitioner during 1939 constructed a preboarding machine and committed itself for additional parts sufficient to construct four additional preboarding machines, and also prior to January 1, 1940, made an oral commitment for additions to the air conditioning of its plant. These are all additional qualifying factors to be considered in determining whether petitioner's average base period net income is an inadequate standard of normal earnings.

Respondent's position as to reconstruction principally is that it is impossible to establish a constructive average base period net income in excess of petitioner's average base period net income determined under section 713 (f), mainly for the single reason that any reconstruction of base period income would have to be based on an assumption that petitioner would have had available to it sufficient nylon yarn to accommodate petitioner's manufacturing capacity and that this assumption could not be made without also assuming that duPont would have started to manufacture nylon yarn 2 years before it did so. Respondent argues there is no authority whatever for making the latter assumption.[8]

---

[8] In his brief, respondent says:

Nowhere in the Statute, the Regulations, or the Treasury Bulletin is any suggestion made that something that could not have been done by a taxpayer because of an external limitation not subject to its control can form the basis of determining reconstructed income.

Congress has prescribed no definite formula for determining the "fair and just amount" of normal earnings to be used as a constructive average base period net income under section 722. It has provided in section 722 (b) (4) that "[i]f the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change * * * two years before it did so, it shall be deemed to have * * * made the change at such earlier time."

Section 35.722–3 (d), unnumbered paragraph 10, of Regulations 112, provides (p. 140) :

Moreover the fact that a business is deemed to have been commenced or changed two years earlier implies the existence of conditions not necessarily present in the period for which reconstruction is being made.

The bulletin (p. 75) gives an example of such a situation as follows:

Certain operating conditions which did not and could not exist throughout the base period may be assumed to exist during such period if these conditions were the basis of the taxpayer's change or commencement of business and if they constitute normal and essential operating conditions. Thus, for example, suppose a dam was built in January 1939 making a river navigable. Immediately thereafter a corporation was formed to furnish a ferry service across the river. Service began in June of 1939 and continued thereafter. The navigability of the river, made possible by the dam, must be considered one of the normal operating conditions of the corporation. As such, it must be assumed to have been in existence throughout the entire base period.

The building of the dam in the above illustration was an "external limitation" at least as much beyond the control of the ferry corporation as the building of the Seaford plant by duPont was beyond the control of petitioner. We do not think any reasonable distinction can be drawn between this illustration and the case at bar.

It is stipulated that substantially all of the nylon yarn produced by duPont during the years 1938 to 1941, inclusive, of over 10,000,000 pounds went to the hosiery industry. Thus, the Seaford plant and the hosiery industry, of which petitioner was a member, were mutually dependent. The hosiery mills converted to the production of nylon hosiery in reliance upon the Seaford plant and conversely the Seaford plant produced nylon yarn in reliance upon the plans and orders of the mills.

In *Southern California Edison Co.*, 19 T. C. 935, the taxpayer contended that in reconstructing its base period earnings it should be assumed that Boulder Dam and the additional water and power produced by Boulder Dam be "pushed back" 2 years. After quoting with approval the above quotation from page 75 of the bulletin, we said (p. 955) :

Thus, a condition that is inextricably associated with the qualifying (b) (4) change may, in proper circumstances, be treated as accompanying that change

in the application of the push-back rule. Whether the construction of Boulder Dam and all that it implies is such a condition is the question here. We think that it is.

In the instant case, we think the supplying of yarn is inextricably associated with petitioner's (b) (4) qualifying changes and should be treated as accompanying those changes in the application of the push-back rule.

Petitioner in its reconstruction has assumed that if it had changed to manufacturing nylon hosiery 2 years sooner, by the end of the base period it would have had available to it on an annual basis exactly what it received from duPont in 1941 of 148,072.7 pounds. We think this assumption violates the last sentence of section 722 (a). On December 18, 1939, duPont allotted to petitioner and petitioner ordered from duPont 67,340 pounds of nylon yarn to be delivered during the first 6 months of 1940. This would be on an annual basis of 134,680 pounds. We think that it is, therefore, reasonable to assume that if petitioner had made its change 2 years sooner, by the end of the base period it would have had available to it on an annual basis at least 134,680 pounds of nylon yarn and we have so found in our findings.

Petitioner in reconstructing its base period earnings has reconstructed its income for 1939 and backcast the result on an index based on its own experience. In reconstructing the income for 1939, it reconstructed the number of nylon stockings it could have manufactured out of 148,072.7 pounds of yarn and then assumed that it would have sold such stockings in place of a like number of silk stockings, but at a much higher profit. These factors are all set out in our findings. The respondent has submitted no reconstruction.

We have carefully considered all of the evidence in the case and are of the opinion that the constructive average base period net income claimed by petitioner is too high. This is due mainly to petitioner's reconstruction of the amount of nylon yarn that would have been available if it had made the change 2 years sooner, and to the reconstructed selling price of the nylon hosiery. Petitioner in its reconstruction assumed that all sales would have been at the selling price of 51-gauge stockings, whereas a large part of the sales would have been at the selling price of 45-gauge stockings, which sold at a lower price. Based upon the facts as set out in our findings, it is our best judgment that a fair and just constructive average base period net income for 1940 is the amount of $351,000 and for the years 1941, 1942, 1943, and 1945, it is the amount of $436,000.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*