DUKE POWER COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 45862.   Filed October 24, 1967.

*J. Marvin Haynes, N. Barr Miller, Arthur H. Adams,** and *Walter D. Haynes,* for the petitioner.

*George J. Le Blanc** and *Sommers T. Brown,* for the respondent.

---

*Mr. Adams died on Nov. 8, 1966, and Mr. Le Blanc died on Feb. 22, 1967. These two men had spent much time and had done an excellent job in preparing the stipulation of facts. Mr. Le Blanc conducted the trial for the Commissioner.

TIETJENS, *Judge:* As indicated in the findings of fact petitioner's average base period net income for the purposes of computing its excess profits credit for the years at issue averaged, in round numbers, $8,277,975.

Petitioner contends on brief that the following constructive average base period net incomes (CABPNI) are fair and just amounts to be used instead of the above actual figures:

| | | | |
|---|---|---|---|
| 1940 | $9,674,810 | 1943 | $11,409,024 |
| 1941 | 10,567,454 | 1944 | 11,418,396 |
| 1942 | 11,211,715 | 1945 | 11,432,158 |

An average CABPNI of $10,952,260 would be the result of using petitioner's reconstructed figures.

In his opening statement counsel for the Commissioner stated that he agreed "that the increase in capacity is a qualifying factor under Section 722(b)(4)" but disagreed that "it entitles petitioner to relief under that section." The Commissioner argued that this apparent concession of qualification was confined to the new generating plants and transmission lines and excluded any distribution lines. To meet this argument petitioner, at the close of the trial, moved to amend the petition so that it would make clear that the claim for relief included Riverbend Unit No. 3, Cliffside, and Buck Unit No. 3, and extensions and commitments to extend transmission and distribution lines. The Court permitted the amendment and we think properly so. The applications for relief, the stipulation of facts, and the evidence received at trial all contained facts with reference to the transmission and distribution lines as well as the generating plants. They were inextricably intertwined and we do not think this was introducing for the first time a new and separate claim for relief. If authority for permitting the so-called clarifying amendment is needed, reference is made to similar action taken by the Court in *Connecticut Light & Power Co.*, 40 T.C. 597, at pages 504–505 of the transcript in that case.

The Commissioner has allowed no relief based upon any increased capacity for production or change in the operation of the electric business of the petitioner and he argues that no basis for any such relief has been proven in this case. However, the stipulation shows

that the three new generating plants could produce electric power considerably cheaper and in greater quantity than several of the plants being used in the base period and that the locations of the new plants would have reduced loss of power in the base period due to the new shorter transportation distances involved. It is also clear that large additional sales could have been made during the base period on secondary and dump contracts if the production of the three new generating plants had then been available. This evidence shows clearly that costs of the amount of electric power actually sold in the latter half of the base period could have been reduced by the use of the new plants in lieu of some of the older less efficient ones and that sales could have been increased. The record also shows that additional customers were gained through the extension of distribution lines. We think the record justifies the allowance for some relief. The difficult question is the amount to be granted.

The Commissioner, relying upon a failure of proof, and claiming that no basis for relief has been proven, has called no witness, has offered no really helpful evidence beyond the stipulation, and has suggested no computation to show or limit relief. The petitioner, claiming relief, has offered evidence by stipulation and uncontradicted testimony of three qualified witnesses to support that claim and has produced the complicated computations necessary to establish a basis for reconstructing a fair and just average base period net income leading to relief for each of the years involved herein. Cf. *Connecticut Light & Power Co.*, 40 T.C. 597.

It is essential to the petitioner's claim that the changes in the character of its business, relied on by the petitioner, proven herein and properly before the Court for consideration, would have resulted in the additional base period sales leading to the amount of relief claimed. No one can say for certain just how much more of the new electric power from the new generating plants could have been sold had it been available during parts of the base period as assumed under the pushback rule. The actual results and experiences of the petitioner during the base period are helpful to some extent and have been taken into account by the petitioner's witnesses and by the Court. Some estimates and approximations are necessary and have been made by the petitioner's witnesses and have been considered by the Court. Cf. *Peter J. Schweitzer, Inc.*, 30 T.C. 42; *Davenport Hosiery Mills, Inc.*, 28 T.C. 201; *N. Hess' Sons, Inc.*, 31 T.C. 385. These courses are necessary and should not be avoided in a case like this one. The evidence contains no opinions on this point by others than the witnesses called by the petitioner. The Commissioner has advanced arguments against accepting the evidence presented as proof of the amount of constructive base period net income. The burden of proof of increased sales is still

upon the petitioner. However, the case must be decided upon the evidence presented. That evidence in places may be less convincing than one might hope but, perhaps, not less than one might expect on such a difficult problem.

The witnesses for the petitioner, called to support its claimed constructive average base period net income, were D. W. Jones, executive vice president in charge of all retail operations, a director and member of the executive committee; L. P. Julian, manager of operations, including coordination of generation and transmission of power from the various sources to supply the system requirements; and Duncan Lennon, a certified public accountant and lawyer, head of Duke's tax department. Jones had been employed by Duke since 1927 and Julian had been employed by Duke since 1935. Lennon had been employed by Duke since 1963.

Jones testified in regard to the increase in sales in terms of kilowatt hours under the pushback rule. Julian testified how the generating facilities would have been used to supply those kilowatt hours. Lennon made computations to show the resulting dollars of gross income less cost and expenses would result in the additional 1939 electric department net income and went on to show the CABPNI's applicable to the years 1940 through 1945.

The CABPNI's as computed by Lennon are as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1940 | $9,674,810 | 1943 | 11,409,024 |
| 1941 | 10,567,454 | 1944 | 11,418,396 |
| 1942 | 11,211,715 | 1945 | 11,432,158 |

These computations are based upon an estimate that, with the aid of the pushback rule, petitioner would have received additional electric department net income of $3,119,269 for the year 1939.

As previously stated, the Commissioner denied any section 722 relief for the committed increase in capacity for production and distribution of electric power. Petitioner, of necessity, based its claims on assumptions and projections grounded on the stipulated facts and supported by computations and oral explanations made by its own witnesses, employees or former employees of petitioner. The Commissioner proffered no CABPNI of his own and called no witnesses. In such cases we have not hesitated to substitute a CABPNI of our own, based on the evidence of record. We have done this many times, when one or both parties have produced CABPNI's which we judged were unacceptable. *Del Mar Turf Club*, 16 T.C. 749; *Rand Beverage Co.*, 18 T.C. 275; *Superior Valve & Fittings Co.*, 18 T.C. 931; *Schneider's Modern Bakery, Inc.*, 19 T.C. 763. As early in section 722 case history as *National Grinding Wheel Co.*, 8 T.C. 1278 (1947), we adopted the principle of *Cohan* v. *Commissioner*, 39 F.2d

540, in establishing a CABPNI as a substitute for that argued for by the parties.

The cited cases indicate that we are not bound to accept the CABPNI's submitted by the parties. Nor are we bound by the opinion testimony of witnesses based on assumptions and projections which leave us unconvinced.

Petitioner's claim is that its profits would have been increased if it had had its new plants and distribution facilities in operation 2 years earlier than it did. The record is not convincing to us that a lack of capacity or high-cost operations were limiting factors on petitioner's business to the extent claimed by petitioner. The Commissioner makes a strong argument that they were not limiting factors at all. Even before the new facilities were operational petitioner was pursuing an effective sales and promotional program which was not curtailed by any limitation on the capacity to produce and deliver power. The market was not one which necessarily called for new and increased power capacity over and above the normal growth of market and expansion of productive capacity which could be expected of an aggressive and alert public utility. The Commissioner argues that the record shows no causal connection between increased revenues and increased capacity. Nevertheless, our judgment is that the new plants and additional distribution facilities would have led to some increase, though not to the extent contended for by petitioner and our finding reflects that judgment.

Most of the petitioner's income came from industrial consumers. Domestic and commercial consumers furnished the smaller part of petitioner's income and the increased distribution facilities would have had a nominal impact on overall earnings.

There is no direct testimony from any putative new industrial consumers that any increase in petitioner's capacity for production and distribution of power would have led them to become consumers for petitioner's product. We have allowed as best we can in the exercise of our judgment for that factor in arriving at our figure as to possibly increased profits.

The area in which petitioner operated, as shown by the stipulated facts, was not nearly so depressed as the rest of the nation by the business depression of the thirties. Consequently, economic recovery in this area was not so pronounced during the late 1930's as it was in other areas. This has been given consideration in our discounting of petitioner's rosy predictions for its business.

The Court recognizes that no exact criteria can be prescribed for a reconstruction under section 722, and that the statute does not contemplate the determination of a figure that can be supported with mathematical exactness. *Superior Valve & Fittings Co., supra* at 938.

Here, as in *Southland Industries, Inc.*, 17 T.C. 1551, 1562, "The parties have stipulated statistical data from which normal earnings for 1939 may be reconstructed. Some such reconstruction, subject to error as it probably is, must be used and has been used by the Court in arriving at a 'fair and just amount to be used as constructive average base period net income'."

All in all, it is our considered judgment that the figure of $1 million arrived at for the increased income from the new facilities is fair and just.

The Commissioner determined that income of the base period for income tax purposes should not be reduced by abnormal deductions within the meaning of section 711(b)(1)(J) but income of the base period should be reduced by certain of those abnormal reductions for section 722 purposes. The petitioner contends that a claim for relief under section 722 does not justify the reduction of the base period net income by these abnormal deductions. The Tax Court has already decided this question in favor of the petitioner. *Jefferson Amusement Co.*, 18 T.C. 44.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: This was the last of the hundreds of section 722 cases before the Court requiring a trial. The Chief Judge assigned it to me for trial and it was tried before me alone on November 8 and 9, 1966. My report, consisting of my findings of fact and opinion in the case, was then submitted, as required by law, to the three Judges who now compose the Special Division of the Court to review section 722 cases. They rejected my opinion and the case was transferred to Judge Tietjens, whose report has now been adopted.

His majority opinion states that "the case must be decided upon the evidence presented." I agree. However, that proper resolve was then forgotten by the author of the opinion because it is not "decided upon the evidence," and I thoroughly disagree with the result reached in that report on the 722 issue. The report is contrary to the uncontradicted, adequate, persuasive evidence presented to me at the trial of this case and is not shown to be supported and is not actually supported by the weight of any evidence in the record before this Court.

The majority opinion contains no explicit explanation of how the finding of $1 million was made. The failure to refer to any evidence is understandable in view of the fact that the majority opinion does not rely upon any evidence but makes its own arbitrary determination not based upon evidence and, in doing so, relies upon conclusions refuted by the evidence.

The petitioner correctly assumed that the facts essential to a judicial

decision of the case should include: The most reliable available estimate of how many of the additional kilowatt-hours generated by the three new plants could have been sold in the base period had they then been available; evidence of how much savings in costs would have resulted from the locations and efficiency of those new plants; and evidence of how much gross income and additional costs and expenses would have been involved in the process. It introduced such evidence by three witnesses who were well qualified. The majority opinion recognizes their qualifications and refers to no specific faults therein. It makes unjustified statements as to supposed testimony which might have been but was not introduced either by the petitioner or by the Commissioner. The Commissioner never suggested that any other person, qualified on these matters of 1936 to 1939, was available as a witness in 1966, when the case was belatedly tried. The Commissioner called no witness. There is no conflict of testimony or failure of proof. I saw, heard, and observed the witnesses who testified. The three Judges who adopted the majority opinion did not.

Jones testified in regard to the increase in sales in terms of kilowatt-hours under the pushback rule. Julian testified how the generating facilities would have been used to supply those kilowatt-hours. Lennon made computations to show the resulting dollars of gross income less costs and expenses which would result in the additional 1939 electric department net income and went on to compute the CABPNI applicable to the years 1940 through 1945.

Jones had had 46 years of selling experience with Duke to qualify him adequately for the task which he performed as a witness here, i.e., determining, to the best of his ability, the probable increase in sales which Duke could have realized if its committed for and completed increase in capacity had been in operation 2 years sooner. He went into great detail and his testimony covers 140 pages of the transcript. He first described the selling activities of Duke during the base period; the methods used; the salesmen; the home economists; lighting engineers; agricultural engineers and others, educating customers and potential customers in the uses of electric power; the equipment they used and the results accomplished in increased customers and increased use and sales of power; and the tests conducted to determine the potentials in various fields. He described the purposes and usual results of reduced rates and the ensuing increases in use of power by customers. He described the methods used to obtain new customers, including direct sales to inhabitants of mill villages who previously had received from their employer only enough power for lights. The mills obtained power for all purposes from Duke at a bulk rate. Duke, when it supplied power directly to mill villages at a higher rate, would put new and better wiring in the villages capable of operating all appliances, would demonstrate the use of and sell water heaters, ranges,

air conditioners, and other appliances to increase its domestic sales of power. Jones described the rural lines, the customers, including farmers, thus served and the efforts to educate and gain new customers and greater use of power on those lines. He told of the possibilities of additional numbers and types of sales which could have been tapped had additional power been available. He testified that an orderly and permissible further increase in sales of power during the base period would have required an increase in generating power and this had been Duke's reason for making the commitments for the new plants. Some potential rural customers complained to Duke and to the State authorities that Duke was too slow in reaching them.

Jones described the development during the base period of new uses of electric power such as the improvements in air-conditioning equipment, the introduction of neon lights, floodlights, and improved bulbs and the extent to which the Duke markets for these improved uses would have been profitable if more capacity for generating the power had been available. Duke had engineers working with architects to provide better wiring for lighting, etc., in new buildings.

He also discussed conditions and prospects in the various classes of customers, such as domestic (including residential and rural), commercial, industrial, and "other utilities," and, contrary to one basis of the majority opinion, was sure that Duke's markets were far from saturated by its sales activities in the base period. He believed that 1939 use of power would have been substantially larger had Duke had the additional power to justify increased sales of appliances. The interruptions of existing interruptable contracts would not have been necessary and the kilowatt-hours delivered on those contracts would thus have been greater.

Jones pointed out, contrary to a conclusion in the majority opinion, that all base period rate reductions by Duke were never ordered by or "in cooperation with" any government authority but were purely voluntary for the purpose of increasing the use of its available power, with the realization that the first result would be a decrease in profits and the desired results in increased use and profits would follow in a year or more. The commitments for the new generating plants were made with these delayed increases in mind. He thus concluded that under a 2-year pushback of the base period rate reductions, base period income, particularly 1939 income, would have been substantially increased.

Jones considered separately each class of customer and various factors affecting different groups within each class and any circumstance which might affect any group, as for example, a reduction in rate as kilowatt-hours use exceeded an agreed minimum. The reason for the interruptions on interruptable contracts was the shortage of dependable power at the time and with increased power of the new

generating plants there would have been no interruptions. These customers all changed later to prime contracts due to the 1939 reduction in rates. Jones added his totals and considered further downward adjustments. Cross-examination did not weaken his opinion but, in places, added some additional helpful detail to support it. He finally concluded that the actual percentages of increase in kilowatt-hours of use realized during the base period would have continued substantially under the push back.

The evidence supports Jones' opinion and nowhere weakens it.

Duke actually sold 2,217,427,000 kilowatt-hours to four classes of its customers in 1939 and of that amount 1,715,069,000 was sold to industrial customers. The majority opinion overlooks the fact that Duke entered into 13 new industrial contracts during 1939 and the full effect of sales on those contracts is not reflected in the above amount. Rate reductions prior to 1939 had caused numerous industrial customers to abandon their own generating plants and to buy all needed power from Duke. This also allowed Duke to make direct domestic sales at higher rates to the residents in the industrial customer's mill village. Twelve to 18 or more months usually elapsed after a rate reduction before its full benefits to Duke would be realized. The actual annual increase in kilowatt-hours from this source averaged 11.4 percent during the base period and Jones estimated that the 1939 industrial sales would have increased by at least 400 million kilowatt-hours with the advantages allowed under the pushback rule.

He also believed that the increase in domestic customers from the extension of rural lines and from the taking over of mill villages had not been fully reflected in 1939 actual sales and had the benefits, allowed to be pushed back by section 722(b)(4), been available 2 years sooner the increase in 1939 sales from this source would have been about 70 million kilowatt-hours. The average annual actual increase in this class of customers had been 19 percent during the base period. The reduced rates had induced some industrial customers to change to commercial and, partly because of improvements in air-conditioning and lighting, Jones believed the section 722 benefits would increase 1939 sales in this field by at least 40 million kilowatt-hours. The base period average annual increase in sales to "other utilities" had been 8.3 percent and Jones believed that those sales would have further increased at that rate with the added capacity of the Duke system. The total increase in 1939 sales which he finally estimated was 565,430,000 kilowatt-hours. This was the conclusion of the man best qualified to make an intelligent estimate. No one on the Court has the ability to make an intelligent estimate of what additional sales might have been made.

Julian was well qualified to know how the generating facilities of Duke would have been used to supply the additional base period kilowatt-hours which Jones testified could have been sold, if then available, and to know the costs of that additional power. His testimony covered 53 pages and references to numerous exhibits. He knew the location and possible use of all of Duke's facilities during the base period. Each one could be used for the needs of the unified system. It was his regular job during the base period to decide when and how long to use each generating unit and the costs per kilowatt-hour of each plant played an important part in the many decisions which he had to make as the demands over the vast system changed from hour to hour each day. He was trying to make the most economical use of the various facilities under his control. He explained in detail what he would have done and why, to supply the additional power under the pushback rule, as nearly as could be estimated. He showed how the power loss in transmission would have been reduced. His conclusions are reasonable and not weakened by any evidence in this case. They are the only ones in the record on the subject upon which he testified and why shouldn't they be accepted as correct? It was his opinion that with the increased lower cost capacity of the new plants and the savings in transmission loss that the interruptable contracts would not have been interrupted and that additional income of $765,000 would have been realized in 1939 from those changes alone.

He used the same amount of hydropower in his constructive power as had been used in 1939. He eliminated Mt. Holly, Tiger, and Eno because they would be replaced by cheaper production from the new plants. He reduced the power from River Bend No. 1 and No. 2 and from Buck No. 1 and No. 2 because of the increased power from the three new plants. He made no change in the purchased power except to eliminate Parr because Duke did not have to buy from Parr and could get the power cheaper from the three new generating plants. He also showed that the transmission losses would be 12.548 percent under the constructive power instead of 14.4 percent actual in 1939. The total energy available to customers and the total actually disposed of in 1939 were both 2,347,967,953 kilowatts and under the reconstruction were 2,913,397,953 kilowatts.

Lennon computed the cost of 1939 reconstructed sales, using for the actual sales their actual cost and for Jones' increased sales any reduced rates applicable thereto, subtracted from that total the actual sales from the same classes of customers as Jones had used, and arrived at reconstructed additional revenue from the additional 565,430,000 kilowatt-hours of $5,182,194. He then computed and subtracted from that gross amount the numerous costs and other expenses of such additional sales to arrive at the net income from those sales. The items he

subtracted were production costs, line expense, station expense, distribution expense, customer accounting and collection, branch and general administrative expense, sales promotion expense, and six different taxes. He thus determined that the net income from the additional 1939 sales would have been $3,119,269. He added to that the actual 1939 sales and backcast that amount over the preceding 3 years, using the stipulated index, to determine the average additional electric department net income of $3,073,284. He then made the necessary computations to determine CABPNI for each of the years 1940 through 1945. In that computation he used the stipulated pre-section 722 excess profits income for each base period year, added the transportation department relief allowed by the Commissioner and the additional electric department net income which he had computed, took into account the section 711(b)(1)(J) items allowed herein and additional base period depreciation allowed after the issuance of the deficiency notice, and applied the variable credit rule as stipulated. His computations were purely mathematical and involved no assumptions of facts not otherwise established in the record. The rate of return on the total assets with this relief would be well within the limits considered proper by the State and Federal authorities. Who takes his place in determining the $1 million amount for the majority opinion?

Julian's testimony that the savings in transmission losses from the favorable locations of the three new plants, the savings from their greater efficiencies, and the elimination of the necessity to interrupt the existing interruptable contracts alone would have resulted in $765,000 of additional income in 1939, without any additional sales. This was factual and was a part of the total additional 1939 net income of $3,119,269 computed by Lennon, based upon the testimony of Jones and Julian and stipulated facts. Yet, the majority opinion has selected an arbitrary round number of only $1 million for the entire 1939 additional earnings, without any reference to or consideration of possible sales of kilowatt-hours, possible savings, or possible costs.

The unsupported and unexplained conclusions relied upon in the majority opinion, that some unidentified evidence was too optimistic, do not establish a sound judicial basis for substituting a vague uninformed guess for the unimpeached evidence of well-qualified witnesses given under oath to the Court which I accepted as correct.