PETER J. SCHWEITZER, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34380. Filed April 16, 1958.

*Mason G. Kassel, Esq.*, and *Ira T. Wender, Esq.*, for the petitioner.
*Maurice S. Bush, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner denied petitioner's claims for excess profits tax relief under section 722 of the Internal Revenue Code of 1939 for the years 1940 through 1945.

The issues presented for decision are whether petitioner is qualified for such relief by reason of the fact that it was committed prior to January 1, 1940, to a change in capacity of its business and did not reach by the end of the base period the earning level it would have reached had it changed its capacity 2 years before it did, and if so, whether petitioner has established a fair and just amount representing normal earnings to be used as a constructive average base period net income. Additional claims for relief under section 721 asserted by petitioner in an amended petition and disallowed by the Commissioner have been abandoned by petitioner.

### FINDINGS OF FACT.

Some of the facts are stipulated. Those facts and the pertinent exhibits are found as stipulated and are incorporated herein by reference.

Petitioner is a New York corporation with its principal place of business in Elizabeth, New Jersey. Petitioner filed its income and excess profits tax returns for the taxable years involved herein with the collector of internal revenue for the fifth district of New Jersey.

Petitioner is a manufacturer of lightweight papers, such as cigarette paper, carbon paper, condenser paper, and lightweight specialties. It was organized in 1923 as the successor to a paper mill corporation and a cigarette paper importing company. These predecessor companies were founded and owned by Peter J. Schweitzer who died in 1922. In addition, the latter owned a cigarette paper mill in France. Upon the death of Peter J. Schweitzer, his family succeeded to his business interests and caused petitioner to be organized under his name to take over the importing business and the paper mills. Petitioner, since its organization, has been owned and controlled by the Schweitzer family.

Throughout the base period petitioner owned and operated 2 paper mills, 1 at Jersey City, New Jersey, and 1 at Elizabeth. The Jersey City mill contained 2 papermaking machines, hereinafter referred to as the No. 1 and No. 2 machines. The former had a wire width of 75 inches and the latter had a wire width of 98 inches. The Elizabeth

mill also contained 2 papermaking machines, hereinafter referred to as the No. 3 and No. 4 machines. Those machines both had wire widths of 98 inches.

Machine No. 1 was obsolete and was idle throughout most of the base period. Machines No. 2, No. 3, and No. 4 were a marked advance in design over machine No. 1. Machine No. 2 was used for the manufacture of one-time carbon paper during the base period. Machines No. 3 and No. 4 could be used interchangeably for the manufacture of condenser paper, carbonizing paper, and cigarette paper. Machines No. 2, No. 3, and No. 4 were idle during part of 1938. The Jersey City mill did not have facilities for manufacturing cigarette paper.

This proceeding relates exclusively to the cigarette paper segment of petitioner's business for which applications for relief from excess profits tax were filed under the provisions of section 722 for the years 1940 through 1945.

The ground for relief asserted was a change in the character of petitioner's business due to a "difference in the capacity for production or operation" within the purview of section 722 (b) (4). The applications stated that petitioner's expansion program was undertaken not merely because the war in Europe had curtailed deliveries from European sources of supply, but because of the greatly increased and growing demand for cigarette paper in this country and the fact that finally a usable raw material had been developed that could be obtained in this country.

During the 1930's there were two main categories of cigarettes manufactured and sold in the United States. In one category were the standard or 15-cent brands, such as Lucky Strike, made by the American Tobacco Company (hereinafter referred to as American Tobacco), Camels, made by R. J. Reynolds Tobacco Company (hereinafter referred to as Reynolds), Chesterfields, made by Liggett & Myers Tobacco Company (hereinafter referred to as Liggett & Myers), Philip Morris, made by Philip Morris & Co., Ltd., Inc. (hereinafter referred to as Philip Morris & Co.), and Old Gold, made by P. Lorillard Company (hereinafter referred to as Lorillard). In the other category were the 10-cent brands, made by such companies as Axton-Fisher Tobacco Co. (hereinafter referred to as Axton-Fisher) and Philip Morris & Co. The 3 largest tobacco companies, Reynolds, American Tobacco, and Liggett & Myers, did not manufacture 10-cent cigarettes.

Prior to World War II, quality French cigarette paper was recognized in the tobacco industry as the leading paper component of cigarette manufacture. French cigarette paper was used exclusively by the major cigarette manufacturers on their standard brands of cigarettes. French cigarette paper was esteemed for its fine burning

quality and odorlessness. Prior to 1940 only the 10-cent brands of cigarettes were wrapped in cigarette paper manufactured in this country.

The cigarette paper manufactured by petitioner during the base period was used by Philip Morris & Co., Axton-Fisher, and Stephano Bros. in their 10-cent brands of cigarettes.

Prior to World War II, Reynolds purchased its cigarette paper from the Papeteries Rene Bollore paper mill of France, hereinafter referred to as Bollore. Liggett & Myers, Lorillard, and Philip Morris & Co. purchased most of their cigarette paper from the Champagne Paper Company of France, hereinafter referred to as Champagne. The cigarette paper used by American Tobacco in the manufacture of cigarettes during the base period was manufactured in France by the Societe Anonyme des Papeteries de Mauduit, hereinafter referred to as de Mauduit of France. American Tobacco regarded the cigarette paper made by de Mauduit of France as superior to all other French-made cigarette paper.

Prior to 1940 cigarette manufacturers believed that French-made cigarette paper owed its superiority in large part to the water used in its manufacture in France. American Tobacco prided itself on the fine, clear water used in the manufacture of cigarette paper by de Mauduit of France. The water used in the making of cigarette paper has an important effect on the taste of the cigarette paper.

The cost of cigarette paper represents a mere fraction of the selling price of a cigarette. During the period 1936 through 1941 the average cost of American Tobacco's cigarette paper per 1,000 cigarettes was approximately 4 cents as compared to a net selling price of not less than $5.38 per 1,000 Lucky Strike cigarettes.

The three major producers of cigarette paper in the United States during the period 1936 through 1945 were the Ecusta Paper Corporation (hereinafter referred to as Ecusta), petitioner, and Smith Paper, Inc. (hereinafter referred to as Smith). Smith was controlled by the Brown & Williamson Tobacco Corporation.

Ecusta was organized during the year 1938. On December 1, 1938, Reynolds and Liggett & Myers each agreed to lend $1,000,000 to Ecusta, and on December 22, 1938, those companies agreed to purchase 50 per cent of their cigarette paper requirements from Ecusta. On September 24, 1940, Philip Morris & Co. agreed to purchase 90 per cent of its cigarette paper requirements from Ecusta. On September 25, 1940, Lorillard agreed to lend $500,000 to Ecusta and also to purchase 90 per cent of its cigarette paper requirements from it. On October 4, 1940, Liggett & Myers agreed to lend $1,500,000 to Ecusta and also to purchase 90 per cent of its cigarette paper requirements from it. On October 7, 1940, Reynolds agreed to pur-

chase 90 per cent of its cigarette paper requirements from Ecusta. All of the above-mentioned agreements. of the tobacco companies to purchase 90 per cent of their cigarette paper requirements were for periods of approximately 11 years.

During 1938 Ecusta endeavored to secure American Tobacco's interest in and financial backing for its paper mill; however American Tobacco refused to give it any financial backing.

During the base period, petitioner manufactured all of its cigarette paper out of a mixture of linen rags and hemp. These were the standard raw materials used by all manufacturers of cigarette paper for many years. The cigarette paper mills in France received some of their linen rag supplies from local rag dealers in France, but for the most part they were dependent upon imports of linen rags from central European countries, the Balkans, and Russia. Petitioner imported most of its linen rags from Europe.

There are basically four steps in the manufacture of cigarette paper. First, fibrous material is cooked with chemicals under steam pressure in large rotary digesters or boilers to produce a pulp. The second step is to eliminate the cooking chemicals from the pulp by washing it and then to bleach the pulp white. Third, the washed and bleached pulp is cut in beaters to shorten the fiber to the proper length for its manufacture on the paper machines. Finally, the pulp mixed with fill, is run into paper on machines.

Cigarette paper consists of approximately 80 to 82 per cent fiber and 18 to 20 per cent fill. Fill is chalk which gives to the cigarette paper its white appearance.

Cigarette paper is sold in rolls called bobbins. Petitioner's standard size bobbin was 29.5 mm. wide and 6,000 meters long. It weighed 8.4 pounds.

Beginning in 1931, petitioner attempted to sell its cigarette paper, manufactured from European rags, to the producers of the standard brands of cigarettes. Petitioner however was unsuccessful in its attempt to sell its cigarette paper to those companies. Petitioner pointed out that it was not safe to depend on a foreign source of supply for such a vital material. But the cigarette companies pointed out to petitioner that in the event of trouble in Europe petitioner was no safer a source of supply than the French cigarette paper manufacturers since petitioner depended on imported European rags for the production of its cigarette paper. It was indicated to petitioner that petitioner's best chance for success in selling cigarette paper to the producers of the standard brands of cigarettes would be if it could produce cigarette paper from domestic raw materials or raw materials obtained from other than European sources.

Petitioner surveyed the raw materials available in the United States and generally outside of Europe from which cigarette paper could be manufactured. Seed flax, because it was widely grown in the United States for the production of linseed oil, appeared to be the most likely material for manufacturing cigarette paper.

Seed flax has a short, thick stalk which contains a high percentage of woody material called shive. The stalk, after removal of the seeds, is a waste product called straw. Seed flax straw, after partial decortication, is called tow. Seed flax straw contains about 25 per cent linen fiber and about 75 per cent shive. Seed flax tow contains about 50 per cent linen fiber and about 50 per cent shive.

In 1932 petitioner successfully made cigarette paper from experimentally grown Virginia flax which was represented to petitioner to be seed flax, but which actually was a form of spinning flax.

Spinning flax is grown for the purpose of producing linen materials. It has a long, slim stalk which contains little shive. Cigarette paper can be manufactured from spinning flax by the same process used in manufacturing cigarette paper from linen rags. However it is not economically feasible to manufacture cigarette paper from spinning flax because of its limited supply and great expense.

Petitioner attempted to manufacture cigarette paper from seed flax tow by the same process used in manufacturing cigarette paper from linen rags. However, the shive in the seed flax tow appeared in the finished paper as brown specks.

Thereafter petitioner experimented with seed flax tow in an attempt to discover a method for manufacturing cigarette paper from seed flax. Such experiments went through three phases. First, petitioner attempted to remove the shive from the seed flax mechanically by decortication, but was unable to find a commercially feasible method to accomplish this. Second, after several years of unsuccessfully experimenting with decortication, petitioner attempted to prepare a bleachable pulp by varying the methods used in cooking linen rags. This too proved unsuccessful because if the seed flax was cooked long enough to make the shive bleachable then the strength of the linen fibers was destroyed. Finally, in late 1938 or early 1939, petitioner approached the problem by treating the seed flax as though it was wood rather than linen fiber. Petitioner experimented with the sulphate process which is one of the methods by which paper is made from wood. In that process, wood is cooked with caustic soda and sodium sulphide at high temperatures for substantial periods of time. Petitioner modified the drastic process used with wood so as to prevent destruction of the linen fiber, i. e., fewer chemicals, lower temperature, and shorter cooking times were used in treating the seed flax tow. In the late summer of 1939 petitioner was con-

vinced that it would be able to develop a successful method for making cigarette paper from seed flax by using the sulphate process since it was found that the sulphur compound used in the cooking protected the linen fiber while permitting the cooking of the shive to the point that the pulp could be bleached.

On December 29, 1939, petitioner cooked approximately 6,000 pounds of Benares Sunn hemp, imported from India, under the sulphate process. This was the only commercial cook made by petitioner during the base period from raw materials other than a mixture of linen rags and hemp. On December 31, 1939, the pulp produced from the Benares Sunn hemp under the sulphate process was bleached and washed. On January 2 and 9, 1940, one-half of the pulp was converted into cigarette paper on cigarette papermaking machines. The other half of the pulp was made into carbon paper on January 14, 1940.

Petitioner's laboratory tests showed that Benares Sunn hemp and seed flax tow reacted the same way under the sulphate process.

On January 2, 1940, petitioner placed its first order for a commercial quantity of seed flax tow. The order was for 12 tons and a portion of it was received about March 1, 1940.

On April 15, 1940, petitioner cooked approximately 5,300 pounds of seed flax tow under the sulphate process in essentially the same manner as it cooked about 6,000 pounds of Benares Sunn hemp on December 29, 1939. On April 22, 1940, approximately 3,000 pounds of the pulp produced was run into cigarette paper.

Prior to December 29, 1939, petitioner had never produced pulp by cooking raw materials under the sulphate process, except in its laboratory. Beginning in the latter part of 1940 petitioner regularly used the sulphate process to produce pulp from seed flax and Benares Sunn hemp.

The standard cooks of raw materials by petitioner during the base period contained approximately 15,000 pounds of raw materials. The raw materials (linen rags and hemp) were practically free of shive.

The cigarette paper manufactured by petitioner in 1940 was in general made from a mixture of linen rags and Benares Sunn hemp or hemp bagging. The cigarette paper manufactured by petitioner from 1941 until 1944 was in general made from a mixture of seed flax tow and Benares Sunn hemp. Such mixture usually contained 75 or 85 per cent seed flax tow and 25 or 15 per cent Benares Sunn hemp.

Seed flax straw varies in color depending upon the part of the country it comes from and also upon the degree of its retting from the weather. These differences require variations in cooking both as to the amount of chemicals used and length of time of the cook. Cooking modifications to suit such varying raw materials were worked out

by petitioner on the basis of trial and error experiences after it began using seed flax as a raw material in the manufacture of cigarette paper.

On April 4, 1939, petitioner ordered a new beating machine of advanced design known as a Jones-Bertrams Patent Beater, to supplement the beaters it already had. The beater had a capacity of 280 cubic feet and its price was $13,000 plus about $5,000 for extras. Delivery was to be made within 2 or 3 months from the date of the order. The contract between petitioner and the manufacturer carried the following provisions:

The Seller agrees, at its own expense, to furnish to the Purchaser a layout plan, acceptable to the Purchaser, for the installation of six (6) Bertrams Beaters, in the Purchaser's beater room basement, within two weeks from the date hereof. If no such plan, acceptable to the Purchaser, is submitted as aforesaid, then the Purchaser, at its option, may terminate this agreement and upon notice of such termination the Seller shall forthwith return to the Purchaser all monies theretofore received by it under this agreement.

The above information was required because petitioner's contemplated expansion (two 125-inch cigarette paper machines) would require six of the beaters and petitioner wanted to be sure they could be fitted into the building. In early November 1939, petitioner ordered a second Bertrams Beater.

The Bertrams Beaters could be used for the refining of all pulp intended for any of the three different kinds of paper manufactured by petitioner, namely, cigarette paper, carbon paper, and condenser paper.

In November 1939, petitioner contracted to purchase a cigarette paper machine, with a wire width of 125 inches, from the Black-Clawson Co. for $132,631. In July 1940, that machine, hereinafter referred to as machine No. 5, was installed in a new building erected in 1940 adjacent to petitioner's Elizabeth plant. The contract for that building was let on January 5, 1940. Prior to January 1, 1940, an architect had been hired by petitioner, plans drawn, and bids submitted by several contractors for erection of such building. Machine No. 5, as ordered and installed, could be used only for the manufacture of cigarette paper; however with substantial alteration it could have been adapted for the production of other types of lightweight papers.

The new building was capable of housing two 125-inch cigarette paper machines.

The capacity of machine No. 5 for the production of salable cigarette paper if operated 22.2 hours per day, 360 days per year, would be 3,230,446 pounds of cigarette paper or 384,576 bobbins of cigarette paper 29.5 mm. by 6,000 meters.

Machine No. 5 would require about 6 or 7 million pounds of rags a year to keep it in full production.

At the time petitioner ordered machine No. 5 in November 1939, it had no orders or commitments on the part of any cigarette manufacturers for any part of its production.

In September 1939, petitioner had an inventory of linen rags of approximately 1,800,000 pounds and an inventory of other linen materials of about 4,000,000 pounds.

In the months of October, November, and December 1939, petitioner placed orders for raw materials with Daniel M. Hicks, Inc., as follows:

| Material ordered | Tons ordered |
|---|---|
| Flax noils | 42 |
| Russian soiled O. G. linens | 150 |
| English hemp twines | 60 |
| Deruiga waste | 235 |
| Noils | 20 |
| Russian old hemp and linen canvas | 30 |
| Hemp cordelettes | 5 |
| Benares #1 Sunn hemp | 3 |
| Chinese hemp rope | 9 |
| Flax waste | 50 |
| French bleached Esporto pulp | 1 |

The following excerpt is taken from the minutes of a special meeting of petitioner's board of directors held on December 21, 1939:

Mr. Louis Schweitzer, President of the Corporation, pointed out that the current situation in Europe had made it necessary and advisable for the corporation to embark upon a program of expansion and a program to meet the contingency of a failure of the supply of raw materials and that certain steps had already been taken in that connection. He stated that such programs were necessary because of the possibility of increased business and because of the uncertainty of the source of supply of imported raw materials resulting from the current situation in Europe. This expansion also contemplates a large increase in business due to the inability of European manufacturers to supply the American market with the finished product. It will be necessary for this company to have larger inventories and have an increased investment in accounts receivable. He further stated that the contemplated programs would involve an expenditure by the corporation of a sum in all probability, in excess of $1,500,000., which amount was arrived at by estimating the cost of new buildings at $250,000., paper machines at $350,000., auxiliary paper making equipment at $150,000., power plant at $250,000., and an outside plant for the preparation of pulp at $500,000. In connection with this program, Mr. Louis Schweitzer stated that contracts for machinery costing approximately $175,000., had already been let out and that plans for the first new paper machine building had been prepared by architects and bids upon such building are to be submitted shortly and that it was his estimate that the cost of that building would be approximately $75,000. * * *

In early 1941, petitioner acquired a new plant at Spotswood, New Jersey. That plant contained 2 new 125-inch papermaking machines, hereinafter referred to as the No. 6 and No. 7 machines.

Petitioner sent a letter, dated October 16, 1941, to the War Department in connection with applications it had made for certificates of necessity to acquire facilities, in which it made the following statement:

At the outbreak of the European War approximately 15% of the Cigarette Paper consumed in this country was manufactured in the United States. The balance was imported from Europe with France as the chief source. With the defeat of that country and the subsequent impossibility for further imports from this direction it became necessary to replace this huge Cigarette Paper requirement by manufacture in the United States. * * *

During the years 1932 through 1939 American Tobacco was concerned about its dependence upon a foreign source for its cigarette paper. The reasons for such concern were the fear that if a war were to break out in Europe, it would not be able to obtain cigarette paper and also the danger to its supply of cigarette paper created by civil unrest in France during that period.

During the base period American Tobacco wanted to obtain a cigarette paper made in the United States from domestic raw materials, which cigarette paper would be at least equal in quality to that produced by de Mauduit of France.

Obtaining cigarette paper made in the United States from domestic raw materials would have been advantageous to American Tobacco during the 1930's because its source of supply would have been assured even if a war broke out in Europe and also because it could better control the quality of the cigarette paper sold to it because of greater proximity.

During the years 1936 through 1951 de Mauduit of France was a wholly owned subsidiary of American Tobacco. During the period January 1, 1936, through December 31, 1942, American Tobacco's investment in the capital stock of de Mauduit of France was $669,211.95. Such investment was written down to $1 as of December 31, 1942.

American Tobacco advanced funds to de Mauduit of France on which there was an outstanding balance at the end of the years 1937 through 1942 as follows:

| Year ended December 31 | Balance outstanding |
| --- | --- |
| 1937 | $701, 698. 88 |
| 1938 | 764, 596. 88 |
| 1939 | 911, 917. 68 |
| 1940 | 911, 794. 41 |
| 1941 | 1, 080, 021. 72 |
| 1942 | 1, 081, 021. 72 |

A full reserve for loss from the above advances was provided as of December 31, 1942.

The de Mauduit Paper Corporation of New York, hereinafter referred to as de Mauduit of New York, was incorporated in 1921 and liquidated in 1941, and was at all times a wholly owned subsidiary of American Tobacco. De Mauduit of New York was an importer and selling agent in the United States for cigarette paper manufactured in France by de Mauduit of France and others.

American Tobacco's cigarette paper purchases from de Mauduit of New York during the years 1936 through 1939 were as follows:

| Year | Amounts | Number of bobbins of all sizes |
|---|---|---|
| 1936 | $1, 655, 579. 34 | 681, 209 |
| 1937 | 1, 564, 730. 93 | 681, 090 |
| 1938 | 1, 606, 552. 72 | 728, 266 |
| 1939 | 1, 587, 978. 85 | 765, 122 |

American Tobacco required all cigarette paper it used to meet certain standards which it had developed over many years in its own research laboratory. It was the practice of American Tobacco's research department to test cigarette paper which came off a commercial run on regular paper mill equipment.

American Tobacco conducted experiments from 1933 to 1936 at de Mauduit of France, in an effort to produce cigarette paper from American flax. A feasible method of producing cigarette paper from American flax was perfected; however, due to the high cost of American flax, American Tobacco decided not to use it in the manufacture of cigarette paper at de Mauduit of France.

During the years 1937, 1938, and 1939, de Mauduit of France increased the number of its paper machines from 5 to 11. During that same period it made other substantial capital improvements and additions to its cigarette paper mill.

After the outbreak of World War II in Europe, American Tobacco took measures to increase the production of de Mauduit of France.

On September 27, 1939, American Tobacco received samples of domestically manufactured cigarette paper from Ecusta, petitioner's principal competitor. During the years 1940 through 1945, American Tobacco bought substantial quantities of cigarette paper from Ecusta.

In December 1939, petitioner informed American Tobacco that it had developed a process for the manufacture of a quality cigarette paper from domestic raw materials and that it had ordered new equipment to expand its capacity for the production of cigarette paper. American Tobacco was interested in the paper and asked for the submission of samples. During February 1940, American Tobacco received six bobbins of cigarette paper from petitioner for testing.

In a letter dated March 29, 1940, Smith offered to supply American Tobacco with cigarette paper made from virgin American flax which

it had been producing since about the beginning of 1939. On April 30, 1940, American Tobacco rejected that offer. Up to that time American Tobacco had been able to get adequate shipments of cigarette paper from de Mauduit of France, which had increased its production.

Following is an excerpt from a telegram sent from George W. Hill, president of American Tobacco, to Charles F. Neiley, vice president in charge of manufacturing of that company, on June 24, 1940:

IN VIEW OF CURRENT WORLD DEVELOPMENTS WE SHOULD IMMEDIATELY BEGIN PLANS FOR PRODUCTION AND REPLACEMENT ON ONE STOCK OF CIGARETTE PAPER * * * BELIEVE YOU SHOULD IMMEDIATELY DEVELOP SOURCE OF BOBBINS SUPPLY LOCALLY EXTENDING FURTHER PLANS WE DISCUSSED BEFORE MY DEPARTURE AND INCLUDING PERHAPS BOTH SCHWEITZER AND THE SMITH PAPER COMPANY AS SUPPLIERS * * *

De Mauduit of France's paper mill was closed in mid-August 1940, on account of World War II.

World War II created a serious situation for American Tobacco and other cigarette manufacturers with respect to cigarette paper supplies theretofore imported from France. During the emergency brought about by the stoppage of cigarette paper shipments from France, American Tobacco would have purchased any cigarette paper made in this country, whether made of seed flax, rags, or other raw materials, if such paper would meet its qualifications.

The first sale of cigarette paper by petitioner to American Tobacco was made under an invoice dated June 10, 1940, and showed a sale of 400 bobbins of cigarette paper of 29.5 mm. by 6,000 meters and 409 bobbins of cigarette paper of 28.5 mm. by 6,000 meters. Delivery of the shipment was made on June 11, 1940. It was the understanding between petitioner and American Tobacco that such cigarette paper was to be made from raw materials with a virgin fiber. Seed flax and Benares Sunn hemp are examples of virgin fibers.

By letter agreements dated in the month of July 1940, and by a purchase order dated July 31, 1940, petitioner and American Tobacco contracted as follows: Petitioner agreed to supply 18,000 bobbins of cigarette paper per month made from virgin materials to American Tobacco for a period of 1 year; the price per bobbin was to be $2.97 per bobbin of cigarette paper 29.5 mm. by 6,000 meters, $2.92 per bobbin of cigarette paper 29 mm. by 6,000 meters, and $2.87 per bobbin of cigarette paper 28.5 mm. by 6,000 meters; American Tobacco had an option to increase purchases to 36,000 bobbins per month.

American Tobacco was concerned with the quality of the cigarette paper it received from petitioner, commencing about the middle of 1940, because too much of the paper did not conform to its standards or was too close to the limits of its standards. American Tobacco

was fearful that cigarette paper of even more deficiency might be included in shipments to it in the future. To remedy the situation, American Tobacco sent one of its employees to petitioner's plant to institute testing procedures for the paper. That employee remained at petitioner's plant for almost a year and a half.

Part of petitioner's difficulty in producing cigarette paper of a quality acceptable to American Tobacco was that it did not have an adequate control laboratory. To correct this situation American Tobacco offered its full cooperation in developing a control laboratory at petitioner's mill.

American Tobacco was petitioner's principal customer for cigarette paper after 1940. Petitioner's sales of cigarette paper to American Tobacco during the period 1940 through 1945 were as follows:

| Year | Sales to American Tobacco |
|------|--------------------------|
| 1940 | $18, 928. 00 |
| 1941 | 1, 407, 514. 42 |
| 1942 | 2, 799, 252. 63 |
| 1943 | 2, 515, 772. 46 |
| 1944 | 2, 886, 358. 80 |
| 1945 | 2, 557, 375. 42 |

During the years 1940 through 1945 American Tobacco purchased the following number of bobbins of cigarette paper of all sizes from the following suppliers:

| Year | Bobbins purchased from— | | | |
|------|-------------------------|---------|--------|-----------|
| | de Mauduit of New York | Champagne | Ecusta | Petitioner |
| 1940 | 693, 629 | | 107, 250 | 6, 445 |
| 1941 | 87, 539 | 12, 100 | 253, 482 | 448, 014 |
| 1942 | | | 541, 904 | 883, 337 |
| 1943 | | | 462, 810 | 798, 844 |
| 1944 | | | 420, 898 | 917, 604 |
| 1945 | | | 423, 290 | 810, 646 |

During the base period, Philip Morris & Co. was interested in obtaining a cigarette paper made in the United States from domestic raw materials. The reason for its interest was primarily to have a second source of supply which it could rely on. It would also have reduced the need for carrying the large inventories of cigarette paper which Philip Morris & Co. was required to carry as a result of the great distance from its then primary source of supply (Champagne).

The total purchases of Philip Morris & Co. of cigarette paper in bobbins of assorted sizes for the years 1936 through 1941 and the breakdown of those purchases among its cigarette paper suppliers are as follows:

| Year | Bobbins purchased from— | | | | |
|------|------------|-----------|--------|------------|--------|
|      | Petitioner | Champagne | Ecusta | de Mauduit | Total  |
| 1936 | 29,668 | 116,023 | -------------- | 6,827 | 152,518 |
| 1937 | 28,362 | 130,173 | -------------- | -------------- | 158,535 |
| 1938 | 14,579 | 191,641 | -------------- | -------------- | 206,220 |
| 1939 | 54,296 | 231,250 | 7,000 | -------------- | 292,546 |
| 1940 | 40,195 | 66,798 | 89,570 | -------------- | 196,563 |
| 1941 | 14,301 | -------------- | 229,285 | -------------- | 243,586 |

On December 31, 1941, petitioner sold its Jersey City mill to the wives of the Schweitzer brothers and their two sisters who were transacting business as a partnership under the firm name of Schweitzer Paper Company.

The following is petitioner's comparative profit and loss statement for the years 1936 through 1939:

|  | 1936 | 1937 | 1938 | 1939 |
|--|------|------|------|------|
| Net sales | $1,466,008.91 | $1,665,432.22 | $1,420,592.75 | $1,682,278.77 |
| Cost of sales | 904,261.40 | 1,130,295.42 | 984,851.64 | 993,640.24 |
| Gross profit | 561,747.51 | 535,136.80 | 435,741.11 | 688,638.53 |
| Other income (or loss) | 5,156.90 | (999.13) | 20,859.47 | 3,447.03 |
|  | 566,904.41 | 534,137.67 | 456,600.58 | 692,085.56 |
| Other expenses: | | | | |
| Officers' salaries | 82,262.49 | 72,500.00 | 56,944.45 | 55,000.00 |
| Other salaries and wages | 31,806.00 | 41,329.38 | 43,615.57 | 46,458.06 |
| Interest | 15,429.76 | 4,205.38 | 8,295.00 | 8,591.93 |
| Taxes | 21,505.13 | 28,643.43 | 32,526.41 | 36,945.35 |
| Depreciation | 77,028.01 | 79,762.39 | 81,888.15 | 57,713.86 |
| Miscellaneous | 104,071.09 | 102,380.95 | 89,611.08 | 101,182.10 |
| Total other expenses | 332,102.48 | 328,821.53 | 312,880.66 | 305,891.30 |
| Net income and excess profits net income | 234,801.93 | 205,316.14 | 143,719.92 | 386,194.26 |

The following is a schedule showing the percentages to net sales of the various items in petitioner's above comparative profit and loss statement for the years 1936 through 1939:

|  | Percentages to net sales | | | |
|--|------|------|------|------|
|  | 1936 | 1937 | 1938 | 1939 |
| Net sales | 100.00 | 100.00 | 100.00 | 100.00 |
| Cost of sales | 61.68 | 67.87 | 69.33 | 59.06 |
| Gross profit | 38.32 | 32.13 | 30.67 | 40.94 |
| Other income (or loss) | .35 | (.06) | 1.47 | .20 |
|  | 38.67 | 32.07 | 32.14 | 41.14 |
| Other expenses: | | | | |
| Officers' salaries | 5.61 | 4.35 | 4.01 | 3.27 |
| Other salaries and wages | 2.17 | 2.48 | 3.07 | 2.76 |
| Interest | 1.05 | .25 | .58 | .51 |
| Taxes | 1.47 | 1.72 | 2.29 | 2.20 |
| Depreciation | 5.25 | 4.79 | 5.76 | 3.43 |
| Miscellaneous | 7.10 | 6.15 | 6.31 | 6.01 |
| Total other expenses | 22.65 | 19.74 | 22.02 | 18.18 |
| Net income and excess profits net income | 16.02 | 12.33 | 10.12 | 22.96 |

Petitioner's excess profits net income for the years 1940 through 1945 computed under the income credit method and without the application of section 722, is as follows:

| Year | Excess profits net income |
|------|---------------------------|
| 1940 | $261,531.70 |
| 1941 | 1,131,172.15 |
| 1942 | 1,051,488.77 |
| 1943 | 1,068,160.37 |
| 1944 | 808,877.98 |
| 1945 | 879,137.47 |

Petitioner's excess profits credits based on income for the taxable years 1940 through 1943 and based on invested capital for the taxable years 1944 and 1945, without the application of section 722, are as follows:

| Year | Excess profits credit |
|------|------------------------|
| 1940 | [1] $226,520.46 |
| 1941 | [1] 273,035.81 |
| 1942 | [1] 273,035.81 |
| 1943 | [1] 273,035.81 |
| 1944 | 286,567.37 |
| 1945 | 301,772.92 |

[1] Based on average base period net income computed under section 713 (f).

Petitioner's excess profits tax liabilities for the years 1940 through 1945, without the application of section 722, are as follows:

| Year | Amount |
|------|--------|
| 1940 | $8,003.37 |
| 1941 | 465,881.80 |
| 1942 | 679,410.30 |
| 1943 | 666,715.56 |
| 1944 | 441,146.39 |
| 1945 | 498,645.77 |

Petitioner's excess profits net income (as defined in the Second Revenue Act for 1940) for each of the base period years applicable in determining petitioner's excess profits credit for 1940; the aggregate thereof; and the average base period net income computed with and without the application of section 713 (f); all of which have been computed without regard to the provisions of section 722, are as follows:

| | |
|---|---|
| 1936 | $186,673.64 |
| 1937 | 162,168.56 |
| 1938 | 118,926.23 |
| 1939 | 315,277.95 |
| Aggregate | 783,046.38 |
| Average base period excess profits net income without application of section 713 (f) | 195,761.59 |
| Average base period excess profits net income with application of section 713 (f) | 238,442.59 |
| Increase under section 713 (f) | 42,681.00 |

Petitioner's excess profits net income (as defined in the Revenue Act for 1941) for each of the base period years applicable in determining petitioner's excess profits credit for 1941, 1942, and 1943; the aggregate thereof; and the average base period net income computed with and without the application of section 713 (f) ; all of which have been computed without regard to the provisions of section 722, are as follows:

| | |
|---|---|
| 1936 | $234, 801. 93 |
| 1937 | 205, 316. 14 |
| 1938 | 143, 719. 92 |
| 1939 | 386, 194. 26 |
| Aggregate | 970, 032. 25 |
| Average base period excess profits net income without application of section 713 (f) | 242, 508. 06 |
| Average base period excess profits net income with application of section 713 (f) | 287, 406. 12 |
| Increase under section 713 (f) | 44, 898. 06 |

Petitioner's sales of cigarette paper and the pounds of cigarette paper sold for the years 1936 through 1942 were as follows:

| Year | Sales | Pounds of cigarette paper |
|---|---|---|
| 1936 | $349, 418. 81 | 1, 054, 411 |
| 1937 | 429, 205. 89 | 1, 269, 216 |
| 1938 | 435, 796. 15 | 1, 329, 261 |
| 1939 | 551, 093. 76 | 1, 690, 423 |
| 1940 | 655, 242. 10 | 1, 923, 564 |
| 1941 | 2, 297, 198. 06 | (1) |
| 1942 | 4, 343, 259. 75 | (1) |

[1] Not available.

During the base period, American Tobacco and Philip Morris & Co. would have purchased cigarette paper produced from domestic raw materials by United States manufacturers if the price and quality of such paper were comparable to that produced in France and if it had been available. Petitioner began to produce such paper in 1940.

During the base period there was an ample supply of seed flax for the production of cigarette paper and there was sufficient knowledge of the techniques of decorticating seed flax straw to make seed flax tow to have produced a seed flax tow comparable in quality to that produced and delivered to the domestic cigarette paper manufacturers in the years 1940 through 1945.

Petitioner during the base period changed the character of its business by increasing its capacity for the production of cigarette paper when it committed itself prior to January 1, 1940, to a course of

58

action leading to the increase of its productive capacity for the production of cigarette paper by the addition of one new 125-inch cigarette paper manufacturing machine (machine No. 5), a building to house that machine, and the auxiliary equipment necessary to operate it.

The major reason petitioner committed itself in 1939 to increase its capacity for production by the addition of machine No. 5 was that petitioner was convinced that by the time it received machine No. 5, it would have sufficiently perfected the method for manufacturing cigarette paper from seed flax and could therefore begin producing commercial quantities of such paper at such time.

Had petitioner changed the character of its business on December 31, 1937, it would have been able to sell substantial quantities of cigarette paper to American Tobacco and Philip Morris & Co. throughout its last base period year.

Petitioner's excess profits tax for the years 1940 through 1945 computed without the benefit of section 722 results in an excessive and discriminatory tax.

Petitioner's average base period net income is an inadequate standard of normal earnings.

Petitioner's business did not reach its full level of normal operations during the year 1940 because machine No. 5 was not installed until July of that year.

Petitioner's business reached its full level of normal operations by the beginning of the year 1941.

A fair and just amount representing normal earnings to be used by petitioner as a constructive average base period net income for the purpose of computing its excess profits credit is $330,000. The constructive average base period net income for the year 1940 is reduced to $240,000 to reflect the application of the variable credit rule. The constructive average base period net incomes for the years 1942 through 1945 are reduced to $307,000 since the Jersey City mill was disposed of by petitioner on December 31, 1941.

OPINION.

We must decide whether the Commissioner erred in disallowing petitioner's application for excess profits tax relief under section 722. To qualify for relief under that section the petitioner must establish that its excess profits tax computed without the benefit of section 722 is excessive and discriminatory for one of the reasons described in 722 (b) (4), and further, it must establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. *East Texas Motor Freight Lines*, 7 T. C. 579 (1946).

Section 722 (b) (4) provides, *inter alia*, that a taxpayer's excess profits tax should be considered to be excessive and discriminatory if its average base period net income is an inadequate standard of normal earnings because the taxpayer changed the character of its business during the base period and its average base period net income does not reflect the normal operation for the entire base period of the business. A difference in capacity for production or operation is considered to be a change in the character of the business, and if such a change was made in a taxable year ending subsequent to December 31, 1939, but was the result of a course of action to which the taxpayer was committed prior to January 1, 1940, it is deemed to be a change on December 31, 1939. It is also provided that if the taxpayer's business did not reach, by the end of the base period, the earning level which it would have reached had the taxpayer made the change in character 2 years before it did so, it shall be deemed to have made the change at such earlier time.

Petitioner contends that it changed its capacity for production of cigarette paper subsequent to December 31, 1939, as a result of a course of action to which it was committed prior to January 1, 1940, and, therefore, under section 722 (b) (4) is deemed to have changed the character of its business on December 31, 1939. Petitioner further contends that its business did not reach, by the end of the base period, the earning level it would have reached had petitioner made the change in character 2 years before it did so, and therefore, under the so-called push-back rule of section 722 (b) (4), petitioner must be deemed to have made the change at such earlier time, i. e., December 31, 1937.

Petitioner contends that its (b) (4) commitment to increase its capacity for the production of cigarette paper consisted of the addition of two new 125-inch cigarette paper machines as well as a new building to house both machines and the auxiliary equipment necessary to operate them.

To sustain its position, petitioner points to its purchase of the Bertrams Beater in April 1939, which purchase was conditioned on the seller providing a layout plan for the installation of six such beaters in petitioner's Elizabeth plant, the reason allegedly being that each new cigarette paper machine would have required three of those beaters. Second, petitioner points to the fact that prior to January 1, 1940, it hired an architect and had plans prepared for an addition to its Elizabeth mill which would be capable of housing two 125-inch cigarette machines. Finally, petitioner quotes from the minutes of a special meeting of petitioner's board of directors held on December 21, 1939 (set out in our Findings of Fact), in which the chairman stated that the "contemplated programs would involve an

expenditure by the corporation of * * * [$350,000 for] paper machines." Petitioner cites *Springfield Tablet Manufacturing Co.*, 22 T. C. 35 (1954), as authority for its position.

In our opinion the record establishes that petitioner falls within the commitment rule to the extent of one new 125-inch cigarette paper machine (machine No. 5), a new building to house that machine (the building erected adjacent to the Elizabeth mill), and the auxiliary equipment necessary to operate that machine (Bertrams Beaters, etc.). However we cannot agree that petitioner was committed, prior to January 1, 1940, to increase its capacity for production by the addition of a second 125-inch cigarette paper machine, since we think petitioner has failed to show that it made a change in position which unequivocally established a commitment to increase its capacity for production by adding such a machine and commitment to a course of action leading to such change. See Regs. 112, sec. 35.722–3 (d).

Petitioner has shown nothing more than that it had a plan for eventually adding a second cigarette paper machine some day in the future, if, and only if, the demand for petitioner's cigarette paper required such addition. We hold that petitioner has failed to show that it was committed to increase its capacity for production or operation by the addition of a second 125-inch cigarette machine, within the meaning of section 722 (b) (4).

*Springfield Tablet Manufacturing Co., supra,* is distinguishable on its facts. In that case, the taxpayer's regular business was manufacturing tablets and school supplies. During October 1939, the taxpayer's board of directors adopted a resolution which provided that the taxpayer would enter the envelope manufacturing business on a moderate scale, with an expenditure of approximately $13,000. The resolution provided for the ordering of three machines immediately, with additional equipment to be purchased as needed. The three machines, and other equipment, with a total cost of about $6,500 were ordered during the base period, and during 1940, two other machines costing $6,400 were ordered. We held that the taxpayer was committed to a course of action calling for the establishment of a new division of its business devoted to the manufacture of envelopes and that at the time of the resolution the taxpayer had a well-formulated intention and plan to enter the envelope-manufacturing field on substantially the scale reached and with substantially the equipment on hand at the end of 1941. Thus the taxpayer's commitment was sufficient to cover the five machines mentioned above. In our case, the petitioner was not establishing a new division of its business, but was merely increasing its capacity for manufacturing a product, cigarette paper, which it had been manufacturing ever

since its incorporation. The increased capacity to which petitioner was contractually committed was one new 125-inch cigarette paper machine. Petitioner's plans took into consideration further expansion of its cigarette paper-manufacturing capacity, by the addition of a second 125-inch cigarette paper machine, only if the demand for petitioner's cigarette paper required it. Furthermore, in the *Springfield Tablet* case, the cost of the five machines and other equipment held to be within the commitment rule was slightly less than the amount of the expenditure provided for by the board of directors in their resolution to undertake the envelope-manufacturing business on a modern scale; while in our case, petitioner's board of directors did not adopt a resolution during the base period providing for expansion of petitioner's facilities, but only discussed a *contemplated* program for increasing its capacity by adding paper machines at a cost of $350,000.

Even though the Commissioner concedes that petitioner was committed to an increase in its physical capacity for the production of cigarette paper by the addition of machine No. 5, he nevertheless contends that petitioner did not change the character of its business during the base period within the meaning of section 722 (b) (4). His argument is that petitioner's commitment for increased capacity did not involve an *absolute* commitment but only a *contingent* commitment for increased capacity because the commitment was dependent upon the development, by petitioner, of a method for the manufacture of cigarette paper from seed flax, which development allegedly did not occur until after the close of the base period. *Claussner Hosiery Co.*, 16 T. C. 1335 (1951) is cited in support of the argument. The Commissioner also argues that while it may be true that petitioner did have a plan, prior to the close of the base period, for a change in the operation of its business through the substitution of seed flax for linen rags as the basic raw material for the manufacture of cigarette paper, since that plan was not actually put into operation until after the base period, it is not entitled to recognition as being the equivalent to a change in the character of petitioner's business within the meaning of section 722 (b) (4).

The Commissioner's contention is without merit. In its applications for relief under section 722, petitioner alleged that it qualified under subsection (b) (4) because of a change in character of its business due to a difference in capacity for production or operation. Petitioner did not allege that it changed the character of its business because of a difference in products furnished and that question is not before us. The question we must decide is whether petitioner *qualifies* under section 722 (b) (4) because of a difference in capacity for production or operation which was the result of a course of action to

which petitioner was committed prior to January 1, 1940. Insofar as machine No. 5 is concerned, the answer is obvious, because petitioner contractually bound itself to purchase machine No. 5 regardless of whether it developed a process by which it could manufacture cigarette paper from seed flax. There were no contingencies in the contract in regards to petitioner's developing such a process and furthermore, there was nothing peculiar about machine No. 5, that is, it could be used to manufacture cigarette paper from linen rags and other raw materials as well as seed flax.

*Claussner Hosiery Co., supra*, relied on by the Commissioner, does not support his argument. In that case the taxpayer claimed relief on the ground of a change in character of its business during the base period consisting of a *difference in products furnished*. The alleged change was from the manufacture of hosiery from silk yarn to the manufacture of hosiery from nylon yarn. The taxpayer did not manufacture for sale to its customers any hosiery of nylon yarn prior to the close of its base period and also nylon yarn was not available for commercial use until long after the close of that period. We held that the taxpayer was not entitled to relief because the change in product, if there was one, did not occur during the taxpayer's base period. Cf. *Davenport Hosiery Mills, Inc.*, 28 T. C. 201 (1957).

Petitioner has established that there was a change in the character of its business within the meaning of section 722 (b) (4). This does not mean however that it is automatically entitled to relief, for that section provides in addition that petitioner must show that because of the change in character of its business its average base period net income is an inadequate standard of normal earnings and also that its average base period net income does not reflect the normal operation for the entire base period of the business.

Petitioner argues that its average base period net income does not reflect any income which might have been earned on the new facilities during the base period, since the new facilities were not actually finished and installed until 1940, and accordingly, petitioner's average base period net income does not reflect the earnings of the business as changed by petitioner's addition to its capacity during the base period. Petitioner also argues that if it had increased its capacity for production 2 years earlier than it did so, its average base period net income would have been substantially greater than it in fact was.

Petitioner's arguments are premised on the assumption that in applying the 2-year push-back rule, not only petitioner's increased capacity for production is pushed back, but also its ability to produce cigarette paper made from domestic raw materials, i. e., seed flax, since it is obvious from the record that an increase in capacity for production, standing alone, made on December 31, 1937, would be of no benefit

to petitioner insofar as section 722 is concerned, because petitioner's actual productive capacity throughout the entire base period was more than sufficient to produce all of the cigarette paper made of linen rags that petitioner could sell.

Ordinarily, in applying the push-back rule, only the (b) (4) qualifying change is pushed back. Thus the statute contemplates merely that the increased productive facilities are to be considered as having been available 2 years earlier, and the first relevant inquiry is whether with such new facilities, under the economic and other conditions as they in fact existed during the base period, the petitioner would have attained by the end of the base period a higher level of earnings. *Southern California Edison Co.*, 19 T. C. 935 (1953). See also, *Green Spring Dairy, Inc.*, 18 T. C. 217 (1952).

However, there is an exception to the limiting condition in the above rule. Certain operating conditions which did not and could not exist throughout the base period may be assumed to exist during such period if those conditions were the basis of the taxpayer's change in character of its business and if they constitute normal and essential operating conditions. Regs. 112, sec. 35.722–3 (d). Thus a condition that is inextricably associated with the qualifying (b) (4) change may, in proper circumstances, be treated as accompanying that change in the application of the push-back rule. *Southern California Edison Co., supra.*

We think there are unusual circumstances present in this case which bring the above-mentioned exception into play.

During the early 1930's petitioner attempted to sell its cigarette paper to the producers of the major brands of cigarettes. However, they were not interested in an American source of supply for their cigarette paper so long as it was manufactured from the same raw materials as the French cigarette paper. The companies indicated that petitioner's best chance for success in selling cigarette paper to them would be if it could produce cigarette paper from domestic raw materials. Consequently petitioner began experimenting with domestic raw materials (mostly seed flax) and finally in late 1938 or early 1939 got on the right track when it began experimenting with the sulphate process, as it experienced immediate signs of success. By late summer 1939, petitioner was convinced that it would be able to perfect the process by which cigarette paper is made from seed flax within a short time, and it therefore undertook an expansion program. That program was influenced in part by the outbreak of World War II, as is apparent from the minutes of the special meeting of petitioner's board of directors (set out in the Findings of Fact) held on December 21, 1939. But that was not the sole reason for petitioner's increasing its productive capacity. This is clear because although petitioner

64

could expect cigarette paper to be in short supply as a result of the war, such increased demand would not benefit petitioner to any substantial degree unless petitioner was assured of a source of raw materials from which it could manufacture cigarette paper. Petitioner could not rely on a continuous supply of linen rags (its then basic raw material) since these rags were imported from European countries. However, seed flax was a domestic raw material and because it was largely a waste product, petitioner could rely on there being an abundance of it available. Thus, since petitioner was on the verge of perfecting a process by which it could manufacture cigarette paper from seed flax, it was in position to undertake the expansion program with the thought that regardless of the effect of the war on cigarette paper, it would soon be manufacturing a product sought by the large tobacco companies (cigarette paper made from domestic raw materials).

During December 1939, petitioner approached American Tobacco with the news that it had developed a method for manufacturing cigarette paper from seed flax and was taking steps to increase its capacity for production of that product. In the early part of 1940 sample bobbins of cigarette paper were submitted to American Tobacco and about the middle of that year American Tobacco began ordering cigarette paper from petitioner in quantity.

Petitioner concedes that it never manufactured cigarette paper from seed flax, in a commercial quantity, during the base period. However it did cook a commercial quantity of Benares Sunn hemp, using the sulphate process, on December 29, 1939, which it washed and bleached on December 31, 1939. One-half of that pulp was run into cigarette paper on January 2 and 9, 1940, which was no problem once the pulp had been successfully cooked, washed, and bleached. Furthermore, petitioner's laboratory tests indicated that if the sulphate process could be used successfully to produce cigarette paper, in a commercial quantity, from Benares Sunn hemp, then seed flax could also be used to produce cigarette paper in commercial quantities, since both products reacted approximately the same under the sulphate process. Accordingly, on January 2, 1940, petitioner ordered 12 tons of seed flax tow of which approximately one-fourth was cooked under the sulphate process in essentially the same manner as the Benares Sunn hemp and then washed, bleached, and run into cigarette paper, during the month of April 1940.

Admittedly all of the bugs were not out of the process by the end of the base period, however by that time petitioner had discovered and was experimenting with the sulphate process. That was the breakthrough which made it possible for petitioner to manufacture cigarette paper from seed flax, and which also made it feasible for petitioner to undertake an expansion program.

In our opinion, the process by which petitioner manufactures cigarette paper from seed flax is inextricably associated with petitioner's commitment to increase its capacity for production and therefore should be treated as accompanying those changes in the application of the push-back rule. See *Davenport Hosiery Mills, Inc., supra,* and *Southern California Edison Co., supra.*

In view of the above facts we think that petitioner's average base period net income is an inadequate standard of normal earnings and that its average base period net income does not reflect the normal operation of the business for the entire base period. Also that petitioner's business did not reach by the end of the base period the earnings level it would have reached had it changed the character of its business 2 years before it did so and therefore, for the purpose of determining a constructive average base period net income, we assume that petitioner made the change in the character of its business on December 31, 1937.

Petitioner contends that if it had changed the character of its business 2 years earlier than it did, then by 1939 it would have been producing cigarette paper made from domestic raw materials comparable in quality to that produced in France and would have been producing that paper at full capacity.

To prove what its sales of such paper would have been during the base period, petitioner relies exclusively upon the testimony of two witnesses, John Crowe, a vice president of American Tobacco, who during the base period was one of its directors and the assistant to the vice president in charge of manufacturing (the department which had charge of the purchase of cigarette paper), and Herbert Atkins, a representative of Philip Morris & Co., who during the base period was in charge of the purchasing and traffic departments of the factories of Philip Morris & Co.

Crowe testified that if petitioner had been able to produce cigarette paper from domestic raw materials comparable in quality to that which American Tobacco purchased from its subsidiary, it would have bought, during the base period, approximately two-thirds of its requirements from petitioner and would have been willing to pay $2.97 per bobbin of 29.5 mm. by 6,000 meters, as that was a very favorable price. His reasons as to why American Tobacco would have purchased that paper were (1) that American Tobacco was greatly perturbed by its dependence upon a foreign source of supply for its cigarette paper because of the continuous unrest in Europe and the threat that a war would break out; (2) that the first company that could advertise that it used an American cigarette paper made from American raw materials by American labor would have had a competitive advantage; and (3) that American Tobacco's competitors

were financing the development of a source of cigarette paper in the United States (Ecusta) so that if American Tobacco did not secure a similar source of cigarette paper, it would have been at a competitive disadvantage.

Crowe testified further that American Tobacco's investment in de Mauduit of France would not have deterred it from giving up its French factory if it could have been assured of a regular source of supply within the United States. Crowe also pointed out that the only major source of cigarette paper available to American Tobacco would necessarily have been petitioner. The reason for this was that the other cigarette paper manufacturers (Ecusta and Smith) were financed or owned by American Tobacco's competitors and the company's lawyers were unwilling to have it purchase large quantities of cigarette paper from them because of the antitrust consequences it might create.

Atkins testified that if petitioner had been able to produce cigarette paper from domestic raw materials comparable in quality to that which Philip Morris & Co. purchased in France, it also would have bought about one-half of its requirements from petitioner during the base period and that Philip Morris & Co. would have been willing to pay $2.92 per bobbin of 29 mm. by 6,000 meters as that was a competitive price at that time. His reasons why Philip Morris & Co. would have purchased that paper were (1) that it was interested in acquiring a second source of supply which would be reliable; and (2) it would have been able to reduce its inventory of cigarette paper if it had a domestic supplier rather than a foreign supplier.

Petitioner contends that the testimony of Crowe and Atkins indicates a trend in the tobacco industry so that if it had been able to produce a quality cigarette paper from seed flax, it would have been able to sell substantial quantities of cigarette paper to other cigarette manufacturers.

Petitioner submitted reconstructions of its base period net income based on the following four assumptions: (1) That it would have sold cigarette paper to American Tobacco to the extent of two-thirds of its requirements; (2) that it would have sold all of the cigarette paper produced by one 125-inch cigarette paper machine operating at full capacity; (3) that it would have sold all the cigarette paper produced by two 125-inch cigarette paper machines operating at three-quarters of their capacity; and (4) that it would have sold all the cigarette paper produced by two 125-inch cigarette paper machines operating at full capacity.

Since we have held that petitioner's change in character of its business included only the addition of one new 125-inch cigarette paper machine, the latter two reconstructions may be disregarded.

The constructive average base period net incomes computed by petitioner under assumptions (1) and (2), without adjustment for the variable credit rule or without adjustment for the sale during the taxable years of facilities which produced income during the base period, were $561,056 and $657,659.

The Commissioner also submitted several reconstructions, and although they increased petitioner's actual base period net income, they were still less than petitioner's average base period net income computed with the application of the section 713 (f) growth formula, and consequently did not result in any relief to petitioner.

The record convinces us that petitioner would have increased its sales of cigarette paper substantially during the year 1939 if it had changed the character of its business on December 31, 1937. There was a large potential market in the United States, during the base period, for a cigarette paper made from seed flax. This is evident not only from the testimony of Crowe and Atkins, but also from the fact that Reynolds and Liggett & Myers, 2 of the 3 largest cigarette manufacturers in the United States, signed long-term contracts in December 1938, in which they agreed to purchase 50 per cent of their cigarette paper requirements from Ecusta. However we think the record does not support petitioner's allegation that it could have sold American Tobacco two-thirds of its requirements and Philip Morris & Co. one-half of its requirements during 1939.

Crowe testified that American Tobacco would have purchased large quantities of cigarette paper from petitioner as soon as it had developed a method for producing cigarette paper from domestic raw materials and was producing such paper in quantity. Of course such paper would have to meet American Tobacco's quality requirements. The record demonstrates that during the first year or two petitioner manufactured cigarette paper from seed flax, it was able to produce a quality cigarette paper, but not on the consistent basis which was reached after the method was perfected. During the trial period American Tobacco rejected more than a usual amount of petitioner's cigarette paper. However, that which was not rejected met American Tobacco's requirements and was used by it in the manufacture of cigarettes. Crowe and Atkins testified that their respective companies would have purchased two-thirds and one-half of their cigarette paper requirements from petitioner if it had been able to produce cigarette paper from domestic raw materials comparable in quality to that which they bought in France. Assuming, under the push-back rule, that petitioner could have started manufacturing cigarette paper from seed flax at the end of 1937, petitioner would have been able to produce a quality cigarette paper during 1939, but not on a consistent basis since it took petitioner a year or so to perfect its manufacturing method.

Thus, although we think the tobacco companies would have purchased substantial quantities of the seed flax cigarette paper from petitioner during 1939, we think they would have been conservative about the amounts they purchased, especially since World War II did not break out until September 1939, and it was not until about the middle of 1940 that the tobacco companies became unable to get any more shipments of cigarette paper from France. Furthermore, in the case of American Tobacco, it had $1,500,000 invested in a subsidiary in France which had been producing a satisfactory cigarette paper for it for many years, and therefore we think it unlikely that it would have cut down the production of its French plant so drastically before the seed flax cigarette paper became a proven product.

We have carefully considered all of the evidence in this case and have concluded that the alternative constructive average base period net incomes claimed by petitioner are too high. On the other hand, we are of the opinion that petitioner's average base period net income computed with the application of the growth formula does not reflect the level of earnings petitioner would have reached had it changed the character of its business on December 31, 1937.

We have therefore exercised our best judgment and have determined that a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of computing petitioner's excess profits credit is $330,000. The Commissioner has urged on brief that the variable credit rule be applied in computing a constructive average base period net income for 1940, and we agree that that rule is properly applicable to that year since petitioner's business did not reach its full level of normal operations during 1940 because machine No. 5 was not installed until July of that year. *Bergstrom Paper Co.*, 26 T. C. 1167 (1956); *Nielsen Lithographing Co.*, 19 T. C. 605 (1952); Regs. 112, sec. 35.722-3 (d). Accordingly we have reduced petitioner's constructive average base period net income for 1940 to $240,000 to reflect the application of the variable credit rule. We have also reduced the constructive average base period net incomes for the years 1942 through 1945 because petitioner sold its Jersey City mill on December 31, 1941, and the earnings of that mill were used by us in determining petitioner's earnings to be included in computing the average base period net income. Petitioner does not dispute that some adjustment for this latter factor should be made.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*